**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MONICA NAVARRO PIMENTEL,
individually and on behalf of a
class of similarly situated persons,
*Plaintiff-Appellee,*

v.

SUSAN DREYFUS, in her official
capacity as Secretary of the
Washington State Department of
Social and Health Services,
*Defendant-Appellant.*

No. 11-35237

D.C. No.
2:11-cv-00119-MJP

OPINION

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, Chief District Judge, Presiding

Argued and Submitted
August 29, 2011—Seattle, Washington

Filed February 29, 2012

Before: Michael Daly Hawkins, M. Margaret McKeown, and
Carlos T. Bea, Circuit Judges.

Per Curiam Opinion

## COUNSEL

Jay D. Geck (argued) and Joseph Christy (briefed), Office of the State Attorney General, Olympia, Washington, for the defendant-appellant.

Gregory D. Provenzano, (briefed and argued), Columbia Legal Services, Olympia, Washington, for the plaintiff-appellee.

Susanna Y. Chu, Kaye Scholer LLP, Washington, D.C., for amicus Legal Momentum.

## OPINION

PER CURIAM:

Plaintiff Monica Navarro Pimentel ("Pimentel") represents a class of legal immigrants in the state of Washington adversely affected by its recent termination of a state-funded

food assistance program for legal immigrants, which exclusively benefitted Washington resident aliens who became ineligible for federal food stamps following the enactment of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996.[1] Pimentel contends that the state, by eliminating food assistance to class members while continuing to administer federal food assistance to U.S. citizens and certain qualified aliens, violates the Fourteenth Amendment's Equal Protection Clause and, by failing to provide class members adequate pre-deprivation notice and opportunity to be heard, also violates the Fourteenth Amendment's Due Process Clause. The district court granted preliminary injunctive relief on both counts, enjoining the state from terminating or reducing state-funded food assistance for class members and ordering the state to provide certain class members individualized determination notices before terminating or reducing their benefits. Susan Dreyfus ("Dreyfus"), in her capacity as Secretary of Washington's Department of Social and Health Services, appeals. We reverse, vacate the preliminary injunction, and remand for further proceedings.

## BACKGROUND FACTS AND PRIOR PROCEEDINGS

### I. Statutory and Regulatory Framework

#### A. The Federal Food Stamp Program

The Food Stamp Act of 1964, 7 U.S.C. § 2011 *et seq.*, established a state-administered, federal food assistance program, currently called the Supplemental Nutrition Assistance Program ("SNAP"), for qualifying low-income households. SNAP's purpose is to alleviate hunger and malnutrition among low-income households and increase their food purchasing power by issuing food stamps and electronic benefits. *See* 7 U.S.C. § 2011.

---

[1]This Act is commonly known and referred to herein as the "Welfare Reform Act," Pub. L. No. 104-193, 110 Stat. 2105 (Aug. 22, 1996), 8 U.S.C. § 1601 *et seq.*

While the U.S. Department of Agriculture determines uniform program-eligibility criteria and benefit-calculation formulae, individual participating states are responsible for certifying qualifying households and issuing benefits. *See id.* §§ 2014-2017; 8 C.F.R. Part 273. State participation is optional, but participating states must submit a plan of operation to the federal government, comply with applicable federal laws and regulations, and agree to spend state funds to cover fifty percent of the program's administrative costs. *Id.* §§ 2020(e), 2025. The federal government pays for the other fifty percent of administrative costs, as well as the entire cost of the actual food benefits. *Id.* § 2025.

Although the program has excluded undocumented immigrants since its inception, most legal immigrants were eligible for federal food stamps prior to 1996 subject to the program's income qualifications.

## B. The Welfare Reform Act of 1996

In 1996 Congress passed the Welfare Reform Act (or "PRWORA"),[2] which dramatically altered alien-eligibility requirements for federal public benefits[3] and for state and local public benefits.[4] One of its stated purposes was to fur-

_____

[2]As used herein, the "Welfare Reform Act" or "PRWORA" refers to the Personal Responsibility and Work Opportunity Reconciliation Act as amended by the Balanced Budget Act of 1997, Pub. L. No. 105-33, §§ 5301-5304, 5306, 5562-5563, 111 Stat. 251 (1997), and the Agricultural Research, Extension, and Education Reform Act of 1998, Pub. L. No. 105-185, §§ 503-508, 112 Stat. 523 (1998).

[3]Title IV of PRWORA defines a "federal public benefit" as one "for which payments or assistance are provided to an individual, household, or family eligibility unit by [(1)] an agency of the United States or [(2)] by appropriated funds of the United States." 8 U.S.C. § 1611(c).

[4]Title IV of PRWORA defines a "state or local public benefit" as one "for which payments or assistance are provided to an individual, household, or family eligibility unit by [(1)] an agency of a State or local government or [(2)] by appropriated funds of a State or local government,"

ther the national immigration policy that "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations, and . . . [that] the availability of public benefits not constitute an incentive for immigration to the United States." 8 U.S.C. § 1601(2).

The Act classifies aliens into two general categories: "qualified aliens" and "non-qualified aliens." *See id.* § 1641. Qualified aliens include aliens lawfully admitted for permanent residence, asylees, refugees, aliens paroled into the United States for at least one year, aliens whose deportation is being withheld, aliens who have been granted conditional entry, certain Cuban and Haitian entrants, and certain victims of battery or extreme cruelty by a spouse or other family member. *See* 8 U.S.C. § 1641(b)-(c). All other aliens are deemed non-qualified aliens.

"Qualified" status is essentially a prerequisite for federal benefits: non-qualified aliens are, with some exceptions not relevant here, ineligible for federal benefits, *see id.* § 1611(a) & (b), whereas qualified aliens are eligible for federal benefits, including SNAP, only if they meet additional criteria. Generally, only qualified aliens who have maintained their qualified status for five or more years are eligible for federal benefits, though there are numerous exceptions to this rule.[5]

---

*excluding any federal public benefit* as defined under 8 U.S.C. § 1611(c). 8 U.S.C. § 1621(c)(1), (3). Thus, a federally funded benefit is still considered a "federal public benefit" even if administered by a state or local agency. Likewise, a joint federal-state cooperative partnership is considered a federal public benefit even if the state contributes its own funds. Though states administer SNAP and fund fifty percent of the program's administrative costs, SNAP is a federal public benefit as defined under PRWORA.

[5]The following subclasses of qualified aliens are eligible for SNAP benefits: (1) refugees, asylees, aliens whose deportation is being withheld,

Initially, the Act barred nearly all non-qualified aliens from even receiving state (or local) public benefits, including state-funded food assistance.[6] On the other hand, states administering state-funded programs are required to extend eligibility to certain classes of qualified aliens.[7] For any aliens neither barred from receiving nor required to receive state benefits, states were to determine their own eligibility requirements. *See id.* § 1622(a). A year after enactment, Congress extended

---

certain Cuban and Haitian entrants, and certain Amerasian immigrants, who remain eligible for SNAP for seven years after the date they are admitted into the United States or granted the relevant status, *see* 8 U.S.C. § 1612(a)(2)(A); (2) permanent resident aliens who have worked for forty qualifying quarters under the Social Security Act, *see id.* § 1612(a)(2)(B); (3) aliens who are veterans or on active duty, as well as their spouses and dependent children, *see id.* § 1612(a)(2)(C); (4) aliens who were lawfully residing in the United States when PRWORA was enacted and who are receiving benefits or assistance for blindness or disability within the meaning of the Food Stamp Act of 1977, *see id.* § 1612(a)(2)(F); (5) members of Indian tribes and certain American Indians born in Canada, *see id.* § 1612(a)(2)(G); (6) aliens who were 65 or older and lawfully residing in the United States when PRWORA was enacted, *see id.* § 1612(a)(2)(I); (7) aliens under age 18, *see id.* § 1612(a)(2)(J); (8) certain Hmong or Highland Laotians lawfully residing in the United States, as well as their spouses and dependent children, *see id.* § 1612(a)(2)(K); and (9) any qualified alien who has resided in the United States with a status within the meaning of the term "qualified alien" for at least five years, beginning on the date of the alien's entry into the United States, *see id.* § 1612(a)(2)(L); *see also id.* § 1613(a) (general five-year residency requirement for all federal means-tested public benefits). *See also* 7 U.S.C. § 2015(f) (containing SNAP eligibility restrictions based on alienage).

[6]This bar did not apply to nonimmigrants as defined under the Immigration and Nationality Act or aliens paroled into the United States under 8 U.S.C. § 1182(d)(5) for less than one year. *See* 8 U.S.C. § 1621(a) & (b).

[7]This group includes: (1) refugees, asylees, aliens whose deportation is being withheld, and certain Cuban and Haitian entrants, who remain eligible for five years after attaining the relevant status, as well as Amerasian immigrants, *see id.* § 1622(b)(1); (2) permanent resident aliens who have worked for forty qualifying quarters under the Social Security Act, *see id.* § 1622(b)(2); and (3) aliens who are veterans or on active duty, as well as their spouses and dependent children, *see id.* § 1622(b)(3).

this discretionary authority to cover any legal aliens rendered ineligible for federal food stamps by PRWORA's restrictions. *See* Title VII of the Emergency Supplemental Appropriations Act of 1997, Pub. L. No. 105-18 (1997), codified at 7 U.S.C. § 2016(i). Under 7 U.S.C. § 2016(i), states may even issue SNAP benefits to such persons so long as the state then reimburses the U.S. Secretary of Agriculture for the value of the benefit and for all administrative costs associated with its issuance. In other words, though states may issue federally ineligible legal aliens food benefits pursuant to the Food Stamp Act, such benefits are to be wholly funded by the state itself.

## C. Washington's Food Assistance Program

Washington has participated in the federal food stamp program since its inception, distributing federal benefits to aliens and citizens without distinction through the Basic Food Program, which is administered by the state's Department of Social and Health Services ("DSHS"). *See* RCW 74.04.500 ("Food stamp program—Authorized").

Upon enactment of the Welfare Reform Act, however, Washington's food stamp program automatically conformed to the new eligibility requirements concerning aliens. *See* RCW 74.04.510 ("Food stamp program— Rules."). Thus, consistent with the federal guidelines, only U.S. citizens and certain qualified aliens remained eligible to receive federally funded SNAP benefits under the Basic Food Program. *See* WAC 388-424-0020.

In 1997, Washington exercised its option to continue providing newly SNAP-ineligible legal immigrants with state-funded food benefits, enacting the Food Assistance Program for Legal Immigrants ("FAP"), also administered by DSHS.[8]

---

[8]As of November 2010, Washington was one of only seven states administering a state-funded food assistance program as a supplement to the federal food assistance program. The other states are California, Connecticut, Maine, Minnesota, Nebraska, and Wisconsin.

*See* RCW 74.08A.120 (providing that "[t]he rules for the state food assistance program shall follow exactly the rules of the federal food stamp program except for the provisions pertaining to immigrant status"). Under FAP, legal immigrants are eligible for state-funded food benefits if (1) they meet the pre-PRWORA alien-status requirements of the Food Stamp Act, and (2) their ineligibility for federal food stamps is due solely to PRWORA's alien-status eligibility provisions, as defined at WAC 388-424-0020. *See* WAC 388-424-0025.

DSHS began administering both SNAP and FAP benefits under its Basic Food Program, determining eligibility and monthly benefits at the household level. A Washington household is eligible for Basic Food benefits so long as at least one member of the household is eligible for either SNAP or FAP benefits. DSHS regulations allow households to receive both SNAP and FAP benefits, provided the total household benefit does not exceed a certain maximum allotment. *See* WAC 388-400-0045, 388-478-0060.[9] Legal immigrants residing in Washington who had been receiving federally funded Basic Food benefits pre-PRWORA but who no longer qualified for SNAP, experienced no break in their coverage. However, their benefits were now fully funded by the state.

DSHS uses a single application form and a single eligibility-review form for food, medical, cash, and other public benefits. Beyond asking applicants to indicate (1) whether they are U.S. citizens, and (2) if not, whether they have documentation of their immigration status, neither the application nor the eligibility-review form indicates two separate funding sources or otherwise distinguishes between federally and state-funded food benefits. Although DSHS determines each applicant's eligibility for either federal or state food benefits,

---

[9]The current maximum monthly benefit is $200 for a household of one, $367 for a household of two, $526 for a household of three, $666 for a household of four, with higher amounts for larger households. WAC 388-478-0060.

it does not communicate these determinations to recipients, informing them simply whether they are eligible for "food assistance benefits" or not.

## II. Plaintiff Monica Navarro Pimentel

Pimentel has been receiving food assistance benefits since 2005. Her household, or "assistance unit," currently consists of herself and her three children, ages fifteen, six, and two. Her two youngest children are U.S. citizens.

Pimentel first applied for Basic Food benefits in 2005, on behalf of herself and her two children; her youngest child was not yet born. She recalls completing only a single application form for food assistance, and that form did not distinguish between SNAP and FAP benefits. She was told, in a letter from the state, that she was approved for expedited food assistance benefits in the amounts of $100 and $94 for the next two months, respectively. A separate letter notified her that she and her oldest child "A.N.P." were denied food assistance benefits because "[i]mmigrants have to meet certain requirements to get these benefits. You do not meet these requirements." The letter cited several provisions of the Washington Administrative Code, namely WAC 388-424-0005, 388-424-0010, 388-424-0015, 388-424-0020, 388-424-0025, 388-462-0015, 388-505-0110, 388-505-0210, and referred Pimentel to a government website. Finally, the letter informed her that "[i]f you disagree with any of our decisions, you may ask to have your case reviewed. You can also ask for a fair hearing. Your fair hearing rights are included in this letter." Pimentel does not recall receiving more specific information from DSHS regarding which immigration requirements she and A.N.P. failed to satisfy.

A year later, Pimentel filed an I-360 self-petition under the Violence Against Women Act of 1994 ("VAWA") on behalf of herself and A.N.P. She was subsequently informed, through an I-797 notice, that she had established a prima facie

case under the VAWA's self-petitioning provisions, qualifying her and her son to receive certain public benefits while they awaited a final decision. Pimentel immediately submitted to DSHS an updated eligibility-review form, attaching the I-797 notice. Her monthly food assistance benefit was subsequently increased to $245.

Soon thereafter, Pimentel received a second notice from the federal government, advising her that her VAWA self-petition had been approved and that U.S. Citizenship and Immigration Services had placed her case under deferred action. She requested and was approved deferred action for her and A.N.P., and both are now pursuing legal permanent residence ("LPR").

As a victim of domestic abuse, Pimentel is a "qualified alien," as defined in WAC 388-424-0001, who would otherwise be eligible for SNAP benefits, but for the citizenship and alien-status requirements of WAC 388-424-0020. Pimentel's attorneys maintain that A.N.P., as a minor child of a victim of domestic abuse, is eligible for SNAP benefits under WAC 388-424-0020(2)(b)(i) and (ii).

Pimentel's youngest child was born in late 2008, and she reported this fact to DSHS about a month later. DSHS then increased her monthly food assistance amount to $565.

## III.  FAP Elimination

### A.  DSHS Repeals FAP

In September 2010, DSHS announced in the Washington State Register that, pursuant to RCW 74.04.050, it might amend or repeal its rules related to eligibility and benefit levels for the state-funded FAP due to budget cuts. Wash. St. Reg. 10-19-135. In November, DSHS published notice of a proposed rulemaking that would amend WAC 388-400-0040, 388-424-0020, and 388-489-0025 and repeal WAC 388-400-

0045 and 388-424-0025. Wash. St. Reg. 10-23-109. DSHS provided a public comment period through December 21 and held a public hearing on that day. Meanwhile, on December 15, Governor Gregoire released her proposed 2011-2013 operating budget, which would eliminate FAP. On December 17, the governor released her proposed 2011 supplemental budget bill, which would eliminate FAP for the balance of the 2009-2011 fiscal term, saving an additional $7.21 million in state funds. DSHS adopted the new regulation on December 29, terminating FAP, effective February 1, 2011. WAC 388-400-0040.

DSHS headquarters notified its regional administrators that FAP was being eliminated as a result of budget reductions. According to John Camp, Administrator for Food Assistance Programs, approximately 10,581 households were receiving state food assistance as of December 2010. Of those, approximately 3,491 households were receiving only FAP benefits, while 7,090 households received a combination of SNAP and FAP benefits.

## B.   Notice Program

### 1.   First Notice

DSHS sent a January 16, 2011 letter to assistance units receiving FAP benefits, such as Pimentel's household. Listing a number of administrative regulations, the letter informed recipients that "[t]he state-funded Food Assistance Program (FAP) will end 01/31/11 because of state budget cuts. You don't have administrative hearing rights when a program ends." However, at the end of the letter was the following: "If you disagree with any of our decisions, you may ask to have the case reviewed. You can also ask for an administrative hearing." The letter listed the members of the assistance unit who, according to DSHS, had been receiving FAP benefits, and set forth the amount of monthly Basic Food benefits that the household would receive when these benefits terminated

on January 31. Pimentel's notice identified her and her son A.N.P. as recipients who would no longer receive state-funded FAP benefits after January 31 due to the program's termination.

### 2.  Second Notice

DSHS sent a second notice to assistance units composed of individuals eligible for both federal and state food assistance. Pimentel received this notice, informing her that "[t]he number of people getting assistance with you has changed" and reiterating that "[t]he state-funded Food Assistance Program (FAP) will end 01/31/11 because of state budget cuts. You don't have administrative hearing rights when a program ends." The notice went on to explain that "FAP provides food benefits to legal immigrants who don't meet the citizenship or alien status rules for federally-funded food benefits. If your household includes people eligible to receive federally-funded food benefits, your food assistance includes both FAP and federally-funded food benefits. This change won't affect your household's receipt of federally-funded food benefits." Like the first notice, the end of the second notice informed Pimentel of her ability to "ask for an administrative hearing."

The letter provided no explanation as to how DSHS determined Pimentel's and her son's alien status. Pimentel says she could not determine whether DSHS had properly calculated her household's federal Basic Food benefits because the letter did not explain why she or her eldest son did not meet the citizenship or alien-status requirements for federal Basic Food benefits, nor did it indicate what information DSHS relied on in making its determination. According to Pimentel, the letter also failed to show adequately how DSHS prorated any ineligible member's income or allowable expenses in accordance with WAC 388-450-0140, or otherwise set forth the income, deduction, and expense figures used by DSHS so that Pimentel could review DSHS's computation of SNAP benefits on her own. Pimentel avers that these letters were the first notice

she ever received from DSHS that she and A.N.P. had been receiving state-funded assistance under FAP rather than federally funded assistance under SNAP. Her attorneys confirm that, based on their review of documents Pimentel received from DSHS (produced in response to their request for public records), none of the prior notices Pimentel received from DSHS indicated that she and A.N.P. were receiving state-funded, rather than federally funded, food benefits, nor did they indicate why Pimentel and A.N.P. were ineligible for federal food assistance.

### 3. Third Notice

After commencement of this lawsuit, DSHS sent a third notice to assistance units receiving state-funded food assistance benefits, intended to explain which household members were ineligible for federal food assistance benefits due to their alien or citizenship status. Pimentel received one of these notices, dated February 3, 2011. Her notice states the following:

> [Monica S. Navarro Pimentel and A.N.P.] are not eligible for federally-funded Supplemental Nutrition Assistance Program (SNAP) benefits under the Washington Basic Food program because they do not meet the citizenship or alien status requirements under WAC 388-400-0040 and 388-424-0020. We reviewed the following documents to decide whether these persons are eligible for federal SNAP benefits through the Washington Basic Food program:
>
> . . .
>
> USCIS I-797, Supplemental Notice of Deferred Action dated 1-11-11
>
> USCIS I-797, Supplemental Notice of Deferred Action dated 1-17-09 (Expired)

USCIS I-797, Establishment of Prima Facie case dated 6-12-06 (Expired)

USCIS I-797C, I360 Petition of Amerasian, Widower or special immigrant dated 5-18-06

. . .

If you disagree with any of our decisions, you may ask to have the case reviewed. You can also ask for an administrative hearing. Administrative hearing rights are included in this letter.

## IV.   Procedural History

Pimentel filed this action on behalf of herself and others similarly situated, seeking class certification under Federal Rules of Civil Procedure 23(a) and 23(b)(2) and declaratory, injunctive, and other appropriate relief pursuant to 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and Federal Rules of Civil Procedure 23, 57, and 65.

The district court entered a temporary restraining order ("TRO") on January 28, 2011 and certified both a class for purposes of the equal protection claim and a subclass for purposes of the due process claim. The Equal Protection Class comprises approximately 10,350 households, or approximately 14,350 persons, who (a) "were receiving state-funded Basic Food benefits under FAP and received notification that these benefits would terminate," or (b) are qualified aliens (or persons permanently residing in the United States under color of law) who in the future would be eligible for Basic Food benefits, but for the fact that they do not meet the citizenship and alien-status requirements of WAC 388-424-0020. The Due Process Subclass is comprised of Washington "residents who . . . are receiving state-funded Basic Food benefits now and whose benefits are being reduced or terminated . . . ."

The district court later issued a preliminary injunction, finding that (1) Pimentel was likely to succeed on both her equal protection and due process claims, (2) she and other class members would suffer irreparable injury without such relief, (3) the balance of hardships tips in the class members' favor, and (4) the public interest supported the issuance of the injunction. The court enjoined Secretary Dreyfus from terminating Pimentel's or other class members' state-funded food assistance while the litigation was pending, and ordered the state to provide Due Process Subclass members with individualized determination notices explaining their ineligibility for the federally funded SNAP program.

The day after the district court issued the preliminary injunction, the Washington legislature signed into law Engrossed Substitute House Bill 1086 ("ESHB 1086"), effective immediately, providing a supplemental operating budget for the remainder of fiscal year 2011 (i.e., until June 30, 2011), which mandated that FAP benefits "be fifty percent of the [SNAP] benefit amount." 2011 Wash. Sess. Law 78. Shortly after reinstatement of partial funding for FAP through enactment of ESHB 1086, DSHS moved for reconsideration of the injunction, which the district court denied.

## STANDARD OF REVIEW

We review a district court's decision to grant or deny a preliminary injunction for abuse of discretion. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). In deciding whether the district court has abused its discretion, we employ a two-part test: first, we "determine de novo whether the trial court identified the correct legal rule to apply to the relief requested"; second, we determine "if the district court's application of the correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 596 F.3d 1098, 1104 (9th Cir. 2010) (internal quotation marks and citations omitted), *cert. granted*

*on other grounds*, 131 S.Ct. 992 (2011). A decision based on an erroneous legal standard or a clearly erroneous finding of fact amounts to an abuse of discretion. *Id.* The district court's conclusions of law are reviewed de novo and its findings of fact for clear error. *Alliance for the Wild Rockies*, 632 F.3d at 1131.

## DISCUSSION

A plaintiff seeking a preliminary injunction must establish (1) likely success on the merits; (2) likely irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under the "sliding scale" approach to preliminary injunctions observed in this circuit, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies*, 632 F.3d at 1131 (citing *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003)). "[A]t an irreducible minimum," though, "the moving party must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation." *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2009).

The State did not challenge below that Pimentel and other class members are likely to suffer irreparable harm, and does not now seem to seriously challenge the district court's findings that the balance of hardships and the public interest weigh in the class's favor. The main issue on appeal, then, is whether Pimentel is likely to succeed on the merits of her equal protection and due process claims. We conclude that the district court, in assessing the likelihood of success and ruling in Pimentel's favor, abused its discretion by finding that the termination of FAP resulted in an equal protection or due process violation. Because no equal protection or due process violation has been alleged, Pimentel's claim does not invite

even rational basis, much less strict, scrutiny. Hence, Pimentel will not succeed on the merits.

## I.   Equal Protection Claim

In evaluating the likelihood of success of Pimentel's equal protection claim, the district court held that Pimentel had established an equal protection violation, and applied strict scrutiny to Washington's termination of FAP. The district court's equal protection analysis "focused on whether DSHS had a compelling interest in deciding to eliminate a state-administered program serving the relevant sub-class of legal immigrants while continuing to administer a program serving U.S. citizens and other legal immigrants." The district court explained that, because "Congress did not enact a uniform rule for states to follow when administering or terminating a state-funded food assistance program," strict scrutiny applied to DSHS's elimination of FAP.[10] In fact, strict scrutiny was not merited in these circumstances because Pimentel has not pointed to similarly situated individuals who have been treated differently by the State. As there can be no equal protection violation without discrimination, Pimentel will not succeed on the merits.

In the absence of an equal protection claim, consideration of the level of scrutiny, whether strict or rational, necessarily falls out of the analysis. To state an equal protection claim of any stripe, whatever the level of scrutiny it invites, a plaintiff must show that the defendant treated the plaintiff differently

---

[10]*State* discrimination against aliens is typically subject to strict scrutiny, *see Graham v. Richardson*, 403 U.S. 354 (1971), while *federal* discrimination is subject to rational basis review, *see Mathews v. Diaz*, 426 U.S. 67 (1976). However, under the uniform-rule doctrine, *state* discrimination is subject to only rational basis review when a state's action merely implements a uniform federal rule which discriminates on the basis of alienage. *See Plyler v. Doe*, 457 U.S. 202, 219 n.19 (1982). In light of our holding with respect to the absence of discrimination, we do not address the district court's uniform rule analysis.

from similarly situated individuals. *Aleman v. Glickman*, 217 F.3d 1191, 1195 (9th Cir. 2000). Only once this threshold showing is made may a court proceed to inquire whether the basis of the discrimination merits strict scrutiny. To the extent that Basic Food benefits remain available to citizens and other aliens, these are federally funded and federally directed benefits with no bearing on how the state chooses to distribute its own funds.[11] Since the recipients under the different programs are therefore not similarly situated, Pimentel may not compare former FAP recipients to current SNAP recipients to allege an equal protection violation.

**[1]** FAP provides benefits exclusively to federally ineligible legal immigrants, while denying such benefits to citizens and federally eligible qualified aliens. Perhaps Washington's *enactment* of FAP may have merited strict scrutiny by treating persons differently on the basis of alienage, since it was accompanied by no similar state program for citizens. *Cf. Adarand Constructors v. Pena*, 515 U.S. 200, 227 (1995) (rejecting the notion of "benign classifications" and applying strict scrutiny to all racial classifications irrespective of the race of the burdened or benefitted group). But while strict scrutiny may apply when a state adopts such measures favoring a subclass of aliens over citizens and other aliens, when the state subsequently repeals those measures, it does not necessarily engage in discrimination. *Cf. Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 483 (1982) ("To be sure, 'the simple repeal or modification of desegregation or antidiscrimination laws, without more, never has been viewed as embodying a presumptively invalid racial classification.' " (quoting *Crawford v. Los Angeles Bd. of Educ.*, 458 U.S. 527, 539 (1982))). When Washington terminated FAP, the state denied the plaintiff class benefits that it did not and still does

---

[11]The sole defendant in this case is Susan Dreyfus, in her official capacity as Secretary of the Washington State Department of Social and Health Services. There are no federal defendants.

not grant to citizens and other aliens.[12] Thus, the difficulty with Pimentel's claim is that she offers no similarly situated individuals as a foundation for her equal protection claim.

[2] Of course, Washington could not evade strict scrutiny simply by first authorizing one state-funded program for citizens and certain aliens and another for a subclass of aliens, and then canceling the latter. But it did not do so here. Although the district court found that DSHS effectively operated SNAP and FAP benefits under one unified "Washington Basic Food Benefits" program, and therefore compared the State's treatment of FAP recipients to that of SNAP recipients to infer invidious discrimination, the comparison was faulty. The appearance of a single program does not overcome this fact: the two programs are, in reality, two separately administered programs funded by two distinct sovereigns. Though Washington is tasked with operating SNAP for its residents, the U.S. Secretary of Agriculture is ultimately charged with

---

[12]In this critical respect, the present case is materially distinguishable from *Aliessa ex rel. Favad v. Novello*, 754 N.E.2d 1085, 1098 (N.Y. 2001), on which Pimentel wrongly relies. There, the New York Court of Appeals applied strict scrutiny to the state's post-PRWORA decision to impose a five-year residency requirement for qualified aliens seeking state-funded and state-administered Medicaid benefits. *See Aliessa*, 754 N.E.2d at 1089-90 & n.3. Previously, New York had provided such benefits, independent of its participation in the federally subsidized Medicaid program, to needy recipients without distinguishing between citizens and legal aliens. *See id.* at 1091-92. Thus, the dispute in *Aliessa* arose not from the termination of a state program benefitting aliens or a subclass of aliens exclusively, but rather from denial of state-funded benefits to a subclass of aliens while continuing to provide those benefits to citizens and other qualified aliens. Pimentel also relies on *Ehrlich v. Perez*, a case which does mirror the present facts in that it too dealt with the state's elimination of a state-funded program exclusively benefitting federally ineligible aliens. 908 A.2d 1220 (Md. 2006). But the Maryland Court of Appeals, in borrowing considerably from *Aliessa* and applying strict scrutiny, ignored the key distinction between the facts it was presented with and those present in *Aliessa*—termination of an exclusive benefit program versus exclusion from a broad-based benefit program—thus rendering its analysis and conclusion unpersuasive.

administering the program, including establishing eligibility criteria and setting the formulae for calculation of benefits. A careful consideration of the contours of the SNAP program, including the statutory scheme, source of funding, extent of state involvement, and history, demonstrates that SNAP is a federal program which the state merely assists in administering, rather than a state program which receives federal assistance, and that its beneficiaries are differently situated from, and cannot be compared to, Pimentel.[13]

**[3]** The statutory scheme establishes that the SNAP program is federal. The statute declares that "raising levels of nutrition among low-income households" is a "policy of *Congress*." (emphasis added). 7 U.S.C. § 2011. The "increased utilization of food . . . will strengthen the Nation's agricultural economy." *Id.* The program applies not just to states, but to Indian reservations, *id.* at § 2013(b), and is balanced against other federal goals and policies. *Id.* at § 2020(c). The operation of the program also remains firmly in the hands of the federal government. It is the "Secretary [who] is authorized to formulate and administer [SNAP]," rather than states. *Id.* at

---

[13]Another case upon which Pimentel relies in calling for strict scrutiny is *Finch v. Commonwealth Health Ins. Connector Auth.*, 946 N.E.2d 1262, 1262 (2011). In *Finch*, the Supreme Judicial Court held unconstitutional Massachusetts's exclusion of certain aliens from the state's Medicaid program, Commonwealth Care. Although the state initially permitted all residents to enroll in Commonwealth Care, it later changed the eligibility requirements to mirror the federal PRWORA classifications and established a separate program to provide slightly different coverage to federally ineligible aliens. *See id.* at 1267-68. But the *Finch* court carefully tethered its analysis to the particular statutory design of Commonwealth Care—a single program distributing a single benefit to eligible individuals, with the federal government reimbursing Massachusetts for those recipients eligible for federal Medicaid. Here, we have not a single, unified program but two distinct ones. Additionally, while the Welfare Reform Act entrusts states with some degree of discretion in administering "designated Federal programs" like Medicaid, it leaves absolutely no discretion for "specified Federal programs" like Food Stamps. *See* 8 U.S.C. § 1612(a), (b).

§ 2013(a). States, in carrying out congressional policy, must submit plans to the Secretary, obtain his approval, and suffer penalties for violations. *Id.* at § 2016(i). The areas in which states are afforded discretion, with the exception of creating an aliens-only program, are few and limited. *See, e.g.*, *id.* at § 2020(p) (immigration verification); *id.* at § 2020(s)(3) (inter-program information).

Nor does the state seek to claim the SNAP program as its own. Pimentel points to no statement of policy by the state of Washington comparable to Congress's statement of goals with respect to SNAP.

**[4]** Finally, although it is correct, as Pimentel emphasizes, that under 7 U.S.C. § 2025, states provide fifty percent of the administrative costs to the SNAP program, this still does not render Washington State anything more than an arm of the U.S. Department of Agriculture, distributing SNAP benefits under a federal program. These cost-sharing provisions do not necessarily indicate that Congress believes that the program furthers state goals. Rather, the statutory scheme demonstrates that the cost-sharing framework is meant to create an incentive to ensure efficient administration of the program—a federal purpose. Under the statute, efficient administration is rewarded, and inefficient administration penalized. With this statutory structure, an analysis of the history of the program is irrelevant: we nonetheless note that Washington has been part of the federal program since its inception, and appears to have relinquished food stamp assistance to its citizens as a state policy goal. The program is therefore grounded in federal law and policy and cannot be compared to, or treated as, a state program.

**[5]** Because Pimentel points to no citizens or aliens in Washington currently receiving FAP-like, state-funded food assistance benefits, the termination of FAP does not constitute discrimination, much less alienage-based discrimination, and therefore should not have been subjected to strict scrutiny. *See*

*Hong Pham v. Starkowski*, 16 A.3d 635, 648 (Conn. 2011) ("The relevant question in determining if state action discriminates on the basis of alienage" is whether the action "provides a benefit to citizens that it does not provide to some or all aliens because of their status as noncitizens."); *Khrapunskiy v. Doar*, 909 N.E.2d 70, 77 (N.Y. 2009) (finding no equal protection violation in New York's elimination of a state-funded supplemental security income program for federally ineligible aliens because "there are *no* state residents receiving public assistance from New York at the level requested by plaintiffs").

In buttressing her equal protection claim, Pimentel suggests that Washington's continued and voluntary participation in SNAP should weigh in favor of finding its termination of FAP unconstitutional. This argument rests on at least one of two presumptions: (1) that every state is required to provide federally ineligible aliens with state benefits as a constitutional condition of participating in SNAP; or (2) that those states that do go beyond SNAP by providing such aliens with state benefits somehow engage in unconstitutional discrimination if they ever seek to return to administering only SNAP benefits.

**[6]** Had Washington never adopted the optional FAP program, an earlier case of ours, *Sudomir v. McMahon*, 767 F.2d 1456 (9th Cir. 1985), dictates that Pimentel would have no equal protection claim arising from Washington's *failure* to provide class members benefits. *Id.* at 1465-66. Though the Welfare Reform Act did not establish a uniform rule with respect to state welfare programs, it did with respect to federally funded SNAP by imposing mandatory eligibility requirements on participating states. Washington, therefore, is not constitutionally obligated to adopt a more permissive eligibility standard than what is required under the uniform federal rule. *See id.*; *see also Hong Pham*, 16 A.3d at 646 ("[T]he equal protection clause does not require the states to 'fill the gap' in coverage for the class members that the federal government had created under the Welfare Reform Act.");

*Khrapunskiy*, 909 N.E.2d at 77 ("[T]he right to equal protection does not require the State to create a new public assistance program in order to guarantee equal outcomes under wholly separate and distinct public benefit programs.").

No more convincing is the contention that states like Washington that adopt their own state-funded programs exclusively for the benefit of SNAP-ineligible aliens thereby voluntarily relinquish the shield otherwise available to states that never establish such programs. Not only does that view lack a legal basis,[14] following it would create a powerful deterrent to states' adoption of voluntary benefits programs assisting federally ineligible aliens. States would be faced with a choice between, on the one hand, not providing those aliens with supplemental state benefits without legal penalties, or on the other, providing the supplemental benefits and thereafter locking themselves into providing benefits equivalent to those provided under SNAP. The Equal Protection Clause does not force states to choose between only those two relatively unpalatable options. Instead, states constitutionally can do precisely what Washington did here: provide supplemental benefits when the state's coffers bulge, but eliminate them when the state's resources diminish.

---

[14]The Connecticut Supreme Court explains why applying strict scrutiny in such contexts is illogical:

> Under such an argument, if any state established a program to benefit only aliens, any attempt to eliminate or reduce the benefit provided only to aliens under that program would be subject to strict scrutiny review simply because such action necessarily will harm only aliens, regardless of how aliens are treated as compared to citizens. To require strict scrutiny review for any reduction of a statutory benefit conferred on aliens alone simply because only aliens are harmed by the reduction would essentially equate that benefit with a fundamental constitutional right, the infringement of which would be subject to strict scrutiny review.

*Hong Pham*, 16 A.3d at 649 n.23.

**[7]** Because Pimentel fails even to allege that the State has treated her less favorably than a similarly situated citizen of the State, her claim of alienage discrimination will fail on the merits.

## II.   Due Process Claim

Pimentel next asserts a procedural due process claim, arguing that inadequate notice accompanied her termination of food benefits. As a threshold matter, it is unclear what property interest Pimentel alleges as the foundation for her procedural due process claim. Pimentel refers to her property interest under varying monikers, first emphasizing the lack of "notice denying SNAP," but then, based on the district court's ruling, characterizing FAP and SNAP benefits as a single program, which offered terminated recipients insufficient procedure.

Notwithstanding Pimentel's apparent conflation of the programs, we follow state law in treating SNAP and FAP benefits as two separate, distinct property interests. *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (Property "entitlements are, '. . . not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.' " (quoting *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972))). Because Pimentel fails to establish a property interest with respect to either FAP or SNAP, her due process claim will not succeed on the merits.

**[8]** Pimentel does not claim, nor could she, that individualized notice requirements must accompany the termination of her FAP benefits, since those benefits no longer exist in the state of Washington. In *Atkins v. Parker,* the Supreme Court drew a clear line "between an individual adverse action and a mass change" in food benefit entitlements. 472 U.S. 115, 126 (1985). Consistent with previous teachings that the "di-

mensions" of the property interest "are defined by . . . law," *Roth*, 408 U.S. at 577, the Court explained in *Atkins* that "the existing property entitlement did not qualify the legislature's power to substitute a different, less valuable entitlement at a later date." 472 U.S. at 129. Pimentel's loss of FAP benefits is "the direct consequence of the statutory amendment . . . that [creates] a different, less valuable property interest after the amendment became effective." *Id.* at 130. FAP no longer exists as a state-defined property interest to which Pimentel may lay claim.

[9] Next, even though Pimentel criticizes the notice requirements that accompanied SNAP benefit denials, she concedes that she herself is ineligible for SNAP benefits. Thus, although the allegedly deficient notice may affect the benefit determinations for other individuals who are potentially SNAP recipients, the deficiency has no bearing on Pimentel's eligibility for food benefits. We agree with the State that Pimentel lacks the concrete and particularized interest required for standing to claim a procedural due process violation with respect to SNAP benefits. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Further, if Pimentel, the sole named plaintiff, lacks standing, the class lacks standing as well. *Cornett v. Donovan*, 51 F.3d 894, 897 n.2 (9th Cir. 1995). Even if we were to consider Pimentel's SNAP due process claim on the merits, Pimentel's admission that she is ineligible for SNAP is fatal: because "the plaintiff[ ] do[es] not explain how the [law] deprived [her] of that interest," her procedural due process claim must fail. *Johnson v. Rancho Santiago Cmty. College Dist.*, 623 F.3d 1011, 1030 (9th Cir. 2010).[15]

---

[15]Pimentel also claims that the loss of her child's food assistance affects her since she will have to bear the cost of purchasing food previously purchased using the food benefits. However, this indirect injury was not alleged in either her complaint or supplemental complaint, nor was it the basis of class certification. Hence, we decline to consider the claim on appeal.

## CONCLUSION

Pimentel either lacks standing or will not succeed on the merits of her claims.[16] Although the other *Winter* factors may tip in her favor and in fact remain unchallenged, "at an irreducible minimum the moving party must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation." *Guzman*, 552 F.3d at 948 (citations omitted); *see also Doe v. Reed*, 586 F.3d 671, 676 (9th Cir. 2009), *aff'd* 130 S. Ct. 2811 (2010) (vacatur of preliminary injunction appropriate after plaintiff failed to establish likelihood of success on the merits).

[10] We therefore REVERSE the district court's order granting the motion for a preliminary injunction, VACATE the injunction, and REMAND for further proceedings consistent with this opinion.

---

[16]We also note that vacatur with respect to the entire class is appropriate. In the standing context, we have explained that as class certification is premised on Pimentel's typicality as a member of the class, a class representative's want of standing is attributed to the entire class. *Cornett*, 51 F.3d at 897 n.2. So too with merits and related determinations, the fortunes of the class rise and fall with those of Pimentel.