# United States Court of Appeals
## For the First Circuit

No. 13-1456

HANS BRUNS and KADRA HASSAN, on behalf of themselves
and other similarly situated individuals,

Plaintiffs, Appellants,

v.

MARY MAYHEW, Commissioner,
Maine Department of Health and Human Services,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Howard, Stahl and Thompson,
Circuit Judges.

Jennifer A. Archer, with whom Kelly Remmel & Zimmerman, Jack Comart, Maine Equal Justice Partners, Zachary L. Heiden and ACLU of Maine Foundation were on brief, for appellants.
Justin B. Barnard, Assistant Attorney General, with whom Janet T. Mills, Attorney General, and Doris A. Harnett, Assistant Attorney General, were on brief, for appellee.

April 28, 2014

**HOWARD, <u>Circuit Judge</u>**.  After Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), narrowing the eligibility of non-citizens for Medicaid and other federal benefits, the state of Maine responded in 1997 by extending state-funded medical assistance benefits to certain legal aliens rendered ineligible for Medicaid.  In 2011, the Maine Legislature terminated these benefits.  The appellants allege that this termination of their benefits violated their rights under the Equal Protection Clause of the Fourteenth Amendment, and presently appeal from the district court's denial of their motion for a preliminary injunction.  Finding no constitutional violation, we affirm the district court's denial of a preliminary injunction and remand for dismissal.

## I.

Medicaid is a cooperative federal-state program created in 1965 as an amendment to the Social Security Act in order to help states provide publicly-funded medical assistance to certain needy citizens.  <u>See</u> <u>Nat'l Fed'n of Indep. Bus.</u> v. <u>Sebelius</u>, 132 S. Ct. 2566, 2581 (2012).  A state's participation in the Medicaid program is voluntary, but once a state chooses to participate it must comply with federal statutory and regulatory requirements in order to receive federal matching funds.  <u>See</u> 42 U.S.C. §§ 1396-1, 1396a, 1396b, 1396c; <u>id.</u> at 2581; <u>id.</u> at 2601, 2604 (Roberts, C.J., joined by Breyer and Kagan, JJ.); <u>Frew ex rel. Frew</u> v. <u>Hawkins</u>, 540 U.S.

431, 433 (2004). The eligibility requirements for Medicaid coverage are governed by federal law. Under the Medicaid Act, participating states must provide full Medicaid services under the approved state plan to certain groups of individuals who meet the eligibility criteria, including "categorically needy" groups. See 42 U.S.C. §§ 1396a(a)(10)(A)(I), 1396d(a); Lewis v. Thompson, 252 F.3d 567, 570 (2d Cir. 2001). For years, federal Medicaid extended medical assistance to eligible individuals without regard to citizenship status or durational residency. By act of Congress, however, the alien eligibility requirements for publicly-funded benefits, including Medicaid, changed dramatically in 1996. See 8 U.S.C. §§ 1601-1646.

In enacting PRWORA, Pub. L. No. 104-193, 110 Stat. 2105 (1996) (also known as the "Welfare Reform Act"), Congress restricted the ability of aliens to access federal public welfare benefits, including Medicaid. See 8 U.S.C. §§ 1611, 1612, 1621, 1622. PRWORA divided non-citizens into categories of "qualified" and "non-qualified" aliens, see id. §§ 1611, 1641(b), and further restricted eligibility for federal welfare benefits by imposing a five-year United States residency requirement for most qualified aliens, see id. § 1613. Although PRWORA authorized states to expand the category of qualified aliens eligible for federal benefits, it prohibited the states from extending federal benefits

-3-

to most aliens residing in the United States for less than five years.  See id. § 1612(b).[1]

PRWORA left the states more discretion in the dispensation of state public benefits, authorizing the states "to determine the eligibility for any State public benefits of an alien who is a qualified alien," including qualified aliens residing less than five years in the United States.  Id. § 1622(a).  The Maine Legislature accordingly responded to PRWORA by enacting Public Law 1997, chapter 530, section A-16 (the "1997 State Legislation," codified at Me. Rev. Stat. tit. 22, § 3762(3)(B)(2), as amended), which empowered the state Department of Health and Human Services ("DHHS") to provide medical assistance benefits to PRWORA-ineligible aliens residing in Maine.  Although these benefits were purely state-funded, this program was jointly administered with the federal-state cooperative Medicaid program for eligible citizens and qualified aliens, and both the state-funded program and the state Medicaid program became known as "MaineCare."  In June 2011, however, the Maine Legislature passed Public Law 2011, chapter 380, section KK-4 (the "2011 State Legislation"), a budgetary measure that terminated state-funded non-emergency medical assistance benefits for PRWORA-ineligible aliens residing less than five years in the United States, essentially repealing the 1997 State

---

[1]We refer throughout this opinion to aliens absolutely barred from federal benefits by PRWORA's five-year residency requirement (such as the appellants here) as "PRWORA-ineligible aliens."

Legislation.  In September 2011, DHHS sent form termination notices to approximately 500 non-citizens, informing them that their MaineCare benefits were being terminated and that they would remain eligible only for emergency care benefits.

The appellants Hans Bruns and Kadra Hassan represent a class of PRWORA-ineligible aliens residing in Maine and rendered ineligible for non-emergency medical assistance benefits as a result of the 2011 State Legislation.  Bruns filed this class action complaint against Mary Mayhew in her official capacity as the Commissioner of DHHS in April 2012, and moved for a preliminary injunction against enforcement of the 2011 State Legislation.  In the complaint, Bruns alleged that the state violated the Equal Protection Clause of the Fourteenth Amendment by continuing to provide MaineCare benefits to United States citizens while denying those benefits to similarly situated non-citizens due solely to their alienage.

The Commissioner opposed the motion for a preliminary injunction, and also filed a motion to dismiss the complaint.  In November 2012, the district court denied without prejudice the Commissioner's motion to dismiss.  Although the relevant legislative history and statutory provisions strongly suggested that the appellants were not similarly situated to United States citizens and eligible aliens receiving Medicaid and thus that they were not treated unequally by the state of Maine, the district

court concluded that this determination ultimately came too close to a factual finding and was therefore inappropriate to resolve on a motion to dismiss.

In March 2013, the district court denied the appellants' motion for a preliminary injunction. The court found that the state had effectively operated two separate medical assistance programs and that the appellants, as PRWORA-ineligible aliens receiving separately-funded benefits from a state program, were not similarly situated to recipients of federal Medicaid. Accordingly, the court concluded that the appellants were unlikely to succeed on the merits of their equal protection claim. Secondarily, the court also concluded that the appellants had not established a potential for irreparable harm. This appeal followed.

## II.

"We review the denial of a preliminary injunction under a deferential standard, reversing only upon finding a mistake of law, a clear error in fact-finding, or other abuse of discretion." Nat'l Org. for Marriage v. Daluz, 654 F.3d 115, 117 (1st Cir. 2011). To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). We have recognized the first

two factors, likelihood of success and of irreparable harm, as "the most important" in the calculus. González-Droz v. González-Colón, 573 F.3d 75, 79 (1st Cir. 2009). The appellants argue that the district court erred in concluding that they had demonstrated neither a likelihood of success on the merits of their equal protection challenge nor a likelihood of irreparable harm absent a preliminary injunction. Because we hold that the appellants cannot succeed on the merits of their claim, we need not consider the likelihood of irreparable harm.

The appellants argue that the termination of their state-funded medical benefits under the 2011 Legislation represented selective alienage-based treatment by the state of Maine. In the appellants' estimation, the state's action discriminated against a suspect class and therefore warrants strict scrutiny, requiring the state to demonstrate that the alienage classification advances a compelling state interest by the least restrictive means available.

The Commissioner advances no argument that the 2011 State Legislation would survive strict scrutiny. Instead, the crux of the Commissioner's defense, and of the district court's ruling, is that Maine did not discriminate against aliens and in favor of citizens at all. The Commissioner suggests that the only alienage-based distinction implicated in this case was the one drawn by Congress in PRWORA, a distinction subject only to deferential

-7-

rational basis review in light of the federal government's broad authority over immigration and naturalization.

This case thus intertwines a core question of equal protection jurisprudence, concerning the proper scope of comparison in determining whether a plaintiff is similarly situated to another group or entity treated more favorably under the law, with notions of federalism concerning the respective roles of federal and state governments in immigration policy and Medicaid alike. Before turning to the merits of this case, we therefore pause to limn some overarching equal protection principles in the context of alienage.

A.    Equal Protection Framework

In order to establish an equal protection violation, a plaintiff must show state-imposed disparate treatment compared with others similarly situated "'in all relevant respects.'" Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp., 246 F.3d 1, 8 (1st Cir. 2001) (quoting Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989), overruled on other grounds by Educadores Puertorriqueños en Acción v. Hernández, 367 F.3d 61 (1st Cir. 2004)). In determining whether two groups are similarly situated, we have identified the somewhat imprecise test as "whether a prudent person, looking objectively . . . would think them roughly equivalent." Dartmouth Review, 889 F.2d at 19. Put differently, "the proponent of the equal protection violation must show that the parties with whom he seeks to be compared have

-8-

engaged in the same activity vis-à-vis the government entity without such distinguishing or mitigating circumstances as would render the comparison inutile." Cordi-Allen v. Conlon, 494 F.3d 245, 251 (1st Cir. 2007).

Alienage, like race and nationality, constitutes a suspect classification under the Fourteenth Amendment. See Graham v. Richardson, 403 U.S. 365, 372 (1971) (invalidating state-imposed alienage-based classifications). Because "[a]liens as a class are a prime example of a 'discrete and insular' minority," a state's alienage-based classifications inherently raise concerns of invidious discrimination and are therefore generally subject to strict judicial scrutiny. Id. (quoting United States v. Carolene Prods. Co., 304 U.S. 144, 152-53 n.4 (1938)). Though states traditionally enjoy broad power to regulate economics and social welfare, even the otherwise "valid interest in preserving the fiscal integrity of [state] programs" is generally insufficient grounds for a state-imposed burden on alienage to survive an equal protection challenge. Id. at 374-75.

The calculus is markedly different for congressional acts distinguishing on the basis of alienage, evaluated under the Due Process Clause of the Fifth Amendment. See Mathews v. Díaz, 426 U.S. 67, 80-85 (1976) (holding that congressional alienage-based restrictions on federal Medicare benefits did not violate due process). Unlike other suspect classifications such as race and

nationality, congressional disparate treatment of aliens is presumed to rest on national immigration policy rather than invidious discrimination.  See id. at 79-80.  Because Congress acts with plenary authority when it legislates the rights and benefits to be afforded aliens present in this country, such congressional acts are appropriately afforded rational basis judicial review. See id. at 80-85.  States do not share in this plenary federal power, though they obviously are impacted by its exercise.  See Plyler v. Doe, 457 U.S. 202, 225 (1982); Hampton v. Mow Sun Wong, 426 U.S. 88, 95 (1976) ("Congress and the President have broad power over immigration and naturalization which the States do not possess.").  The Supreme Court has, however, stated that "if the Federal Government has by uniform rule prescribed what it believes to be appropriate standards for the treatment of an alien subclass, the States may, of course, follow the federal direction."  Plyler, 457 U.S. at 219 n.19.

Because Medicaid, unlike Medicare, is not solely funded and administered by the federal government, this case does not fall neatly within the holding of Mathews.  On the other hand, the alienage-based distinction in this case does not originate purely from state legislation, unlike the restrictions struck down in Graham.  Instead, this case presents a Gordian knot of federal and state legislation effecting an adverse impact on resident aliens: a federal-state cooperative program (Medicaid), the eligibility for

-10-

which was subsequently limited on the basis of alienage by federal legislation (PRWORA), to which the state of Maine responded by first creating, and then terminating, supplemental state-funded medical assistance benefits for PRWORA-ineligible aliens only. We now examine this state legislation in more detail in order to properly evaluate the equal protection claim before us.

### B. MaineCare

In concluding that the appellants were unlikely to succeed on the merits of their equal protection claim, the district court explained that "because there were two separate programs [in Maine] distributing medical benefits to Medicaid-ineligible qualified aliens and citizens . . . [and] citizens were statutorily unable to receive health benefits under the same state-sponsored program, the Plaintiffs are unable [to] show [that] they were similarly situated with citizens for equal protection purposes." Bruns v. Mayhew, 931 F. Supp. 2d 260, 273 (D. Me. 2013). It arrived at this conclusion after a thorough analysis of the "[c]ontours of the [d]isputed [p]rograms," noting inter alia that "[t]he statutorily mandated separate funding structures for MaineCare, which receives federal and state funds, and the aliens-only program, which received only state funds post-PRWORA, is the first indicator of [the programs'] independence"; that these separate funding structures "also signify that the programs were separately controlled by the governments that funded them"; and

that "the history of the benefit programs, specifically the federal government's express relinquishment of its former obligation to provide benefits for qualified aliens subject to the residency requirement and the State's decision to assume that obligation only underscores their autonomy." Id. at 272-73.

The appellants aver that "[t]he District Court erred as a matter of fact and law when it concluded that there was no class of citizens who were similarly situated to the Plaintiffs," because (in their view) Maine operated a "unitary medical assistance benefits program" for citizens and aliens alike. To evaluate this contention, we begin where the district court did -- by examining the legal contours through which such publicly-funded benefits have been provided to Maine residents.

As we have explained above, PRWORA seismically shifted the landscape of Medicaid funding in 1996. Despite the cooperative federal-state nature of Medicaid benefits, PRWORA classifies Medicaid as a "federal program" from which many subclasses of aliens are excluded, including legal residents who have not yet resided in this country for five years. Participating states are statutorily obligated to alter Medicaid benefits available to their residents in order to remain compliant with evolving federal law. Nevertheless, in enacting PRWORA Congress authorized the states to provide purely state-funded welfare benefits to legal aliens, and in 1997, the state of Maine enacted legislation to ameliorate the

-12-

effects of PRWORA for legal aliens who would have remained eligible for Medicaid benefits but for PRWORA. Maine therefore dispensed both the Medicaid medical assistance funds for eligible residents and the state supplemental medical assistance funds for PRWORA-ineligible alien residents under the auspices of MaineCare. In 2011, the state legislature repealed the 1997 State Legislation's grant of state supplemental medical assistance benefits for PRWORA-ineligible aliens. At present, publicly-funded medical assistance remains available to eligible Maine residents through federal-state Medicaid funding still known locally as MaineCare.

With this context established, we turn to the appellants' first contention that the district court erred in construing the 1997 State Legislation as establishing a new state program distinct from Medicaid. The 1997 State Legislation mandated that "funds must be expended"

> [t]o provide financial and medical assistance to certain noncitizens legally admitted to the United States. Recipients of assistance under this subparagraph are limited to the categories of noncitizens who would be eligible for the TANF or Medicaid programs but for their status as aliens under PRWORA. Eligibility for the TANF and Medicaid programs for these categories of noncitizens must be determined using the criteria applicable to other recipients of assistance from these programs.

Me. Pub. L. 1997, ch. 530, § A-16 (codified at Me. Rev. Stat. tit. 22, § 3762(3)(B)(2), as amended). In the appellants' interpretation, the last sentence bespeaks a single medical

-13-

assistance program provided by the state of Maine for citizens and aliens alike. Parsing its language closely, they suggest that had the legislature intended to create a separate and distinct program for ineligible aliens, "it would have referenced other recipients of 'those programs,' rather than 'these programs.'"

The appellants, however, gloss over the immediately preceding sentence, which expressly limits state assistance to "the categories of noncitizens who would be eligible for the TANF or Medicaid programs but for their status as aliens under PRWORA." This sentence clearly evinces the legislature's awareness that this subclass of aliens was ineligible for federally-sponsored Medicaid due to "their status as aliens under PRWORA." We therefore agree with the Commissioner's suggestion that "a sensible reading of the final sentence" shows only that the legislature intended to utilize "the same eligibility standards (save citizenship requirements)" for PRWORA-ineligible aliens applying for state assistance as were utilized for Medicaid applicants.

The appellants also allege that, in practice, Maine operated a single state healthcare program, MaineCare, which did not distinguish between eligible citizens and aliens on the one hand and PRWORA-ineligible aliens on the other. The appellants emphasize, inter alia, that the state referred to all public medical assistance benefits as "MaineCare" and informed PRWORA-ineligible aliens in 2011 that their "MaineCare" benefits were

-14-

being changed; that the state applied the same eligibility criteria and used the same application form for all MaineCare applicants; that citizens and non-citizens received the same "full benefits"; and that the state occasionally submitted its expenditures on PRWORA-ineligible aliens to the federal government, which later sought reimbursement from the state. The Commissioner acknowledges that the appellants' materials "collectively suggest that the Maine Department of Health and Human Services did not distinguish, both outwardly and in certain aspects of its internal administration, between the Medicaid benefit provided to citizens and eligible aliens and the state-created benefit that was provided to Medicaid-ineligible aliens." Nevertheless, the Commissioner maintains that public perception and common administration do not render the federal-state Medicaid benefits and the state aliens-only benefits legally indistinct for equal protection purposes.

We agree with the Commissioner. The veneer of a single MaineCare program merely obscured the legal reality that, from 1997 to 2011, MaineCare recipients received benefits from two distinct programs: one funded jointly by the federal and state governments, with the federal government retaining ultimate authority over, inter alia, eligibility criteria; and the other fully funded and controlled by the state government. It was the federal government that determined the appellants' ineligibility for Medicaid benefits by enacting PRWORA, to which the state responded by extending

equivalent state-funded medical assistance benefits to the appellants for a time.

The Ninth Circuit's analysis in <u>Pimentel</u> v. <u>Dreyfus</u>, 670 F.3d 1096 (9th Cir. 2012), rejecting a comparable equal protection challenge to the termination of a state food assistance program for PRWORA-ineligible aliens only, is particularly instructive here. Like MaineCare, Washington's "Basic Food Program" jointly provided state-funded food assistance to PRWORA-ineligible aliens and federal Supplemental Nutrition Assistance Program ("SNAP") benefits to citizens and eligible aliens. The agency employed a single application form and identical eligibility criteria for all aid recipients, and the aid recipients themselves were not informed of the source of their benefits. <u>Id.</u> at 1101-02. The state was also authorized to issue federal SNAP benefits to ineligible aliens so long as it then reimbursed the federal government for the value of the benefit and associated administrative costs. <u>Id.</u> at 1100-01. The Ninth Circuit nevertheless held that "[t]he appearance of a single program does not overcome this fact: the two programs are, in reality, two separately administered programs funded by two distinct sovereigns," leaving the plaintiffs dissimilarly situated to SNAP recipients. <u>Id.</u> at 1107. The court elaborated:

> A careful consideration of the contours of the SNAP program, including the statutory scheme, source of funding, extent of state involvement, and history, demonstrates that SNAP is a federal program which the state merely assists in administering, rather than a

-16-

> state program which receives federal
> assistance, and that its beneficiaries are
> differently situated from, and cannot be
> compared to, [the named plaintiff].

Id. at 1108; see also Hong Pham v. Starkowski, 16 A.3d 635, 654-55 (Conn. 2011) (examining the contours of Medicaid and finding plaintiffs, PRWORA-ineligible aliens formerly receiving supplemental state medical assistance benefits, dissimilarly situated to Medicaid recipients "[i]n light of the scope of federal control over the federal Medicaid program and the extent to which the federal government funds that program").

Contrary to the appellants' suggestion that Maine operated a single state medical assistance program for all state residents, we therefore agree with the district court's conclusion that MaineCare comprised two separate medical assistance programs: federal-state cooperative Medicaid and a state supplemental program for PRWORA-ineligible aliens only. When it repealed the supplemental aliens-only program, the state of Maine did not deprive the appellants of a benefit that it continued to provide to citizens -- or to anyone else, for that matter. Consequently, the appellants cannot point to any similarly situated individuals who remain "engaged in the same activity vis-à-vis the government entity." Cordi-Allen, 494 F.3d at 251 (emphasis added); see also Hong Pham, 16 A.3d at 650 ("[T]he equal protection clause does not require the state to treat individuals in a manner similar to how others are treated in a different program governed by a different

government."); <u>Pimentel</u>, 670 F.3d at 1107; <u>Soskin</u> v. <u>Reinertson</u>, 353 F.3d 1242, 1255-56 (10th Cir. 2004); <u>Khrapunskiy</u> v. <u>Doar</u>, 909 N.E.2d 70, 76-77 (N.Y. 2009).[2]

The fact that Maine voluntarily participated in Medicaid does not alter our analysis. By the appellants' logic, Maine's continued voluntary participation in Medicaid and compliance with PRWORA violated the Equal Protection Clause, requiring the state to either withdraw from Medicaid altogether or to create an equivalent state-funded medical assistance benefit for PRWORA-ineligible aliens. Of course, Maine did the latter for a time; according to the appellants, the state's termination of those equivalent state-funded benefits placed it in violation of the Equal Protection

---

[2]In light of this distinction between federal and state action, we find the appellants' cases unpersuasive. <u>Aliessa ex rel. Fayad</u> v. <u>Novello</u>, 754 N.E.2d 1085 (N.Y. 2001), addressed a <u>state</u>'s discretionary imposition of alienage-based criteria for purely state-funded benefits, rendering the plaintiff aliens similarly situated to citizens still receiving these benefits. (The New York Court of Appeals itself later underscored this distinction in <u>Khrapunskiy</u>, 909 N.E.2d at 76-77.) Although <u>Ehrlich</u> v. <u>Perez</u>, 908 A.2d 1220 (Md. 2006), invalidated the termination of a state-funded benefits program for PRWORA-ineligible aliens only, the Maryland court relied heavily on <u>Aliessa</u> without addressing this distinction. As for <u>Unthaksinkun</u> v. <u>Porter</u>, No. 11-588, 2011 WL 4502050 (W.D. Wash. Sept. 28, 2011), <u>Finch</u> v. <u>Commonwealth Health Insurance Connector Authority</u> (<u>Finch II</u>), 959 N.E.2d 970 (Mass. 2012), and <u>Finch</u> v. <u>Commonwealth Health Insurance Connector Authority</u> (<u>Finch I</u>), 946 N.E.2d 1262 (Mass. 2011), these cases involved Medicaid "demonstration programs" rather than federal-state cooperative Medicaid programs <u>per</u> <u>se</u>. <u>See</u> <u>Finch II</u>, 959 N.E.2d at 974, 981 (explaining that Massachusetts' Commonwealth Care program, although federally-subsidized, was "State-initiated," "entirely State-run," "entirely under State control, and not bound by uniform Federal rules").

-18-

Clause, just as it would have been had it never extended those benefits in the first place.

The Equal Protection Clause does not place the state in such a Procrustean bed. The fact that Congress discriminated on the basis of alienage in enacting PRWORA does not also establish alienage-based discrimination by Maine merely because of its continued Medicaid participation and required compliance with PRWORA. While the federal government determines certain baseline eligibility requirements and selects particular classes of categorically needy persons who are eligible to receive Medicaid benefits, a state, by choosing to participate in Medicaid, generally adopts the grouping of federal eligibility requirements as a whole. Like the Hong Pham court, we therefore conclude that if Maine can be said to have "discriminated" at all, it only did so on the basis of federal Medicaid eligibility, a benign classification subject to mere rational basis review. See id. at 659; cf. Soskin, 353 F.3d at 1255-56.

Like other courts facing similar post-PRWORA equal protection claims, we therefore conclude that the state was under no constitutional obligation to "fill the gap" created by PRWORA by extending equivalent state-funded benefits to federally-ineligible aliens. See Korab v. Fink, No. 11-15132, 2014 WL 1302614, at *2, *9 (9th Cir. Apr. 1, 2014); Pimentel, 670 F.3d at 1109; Hong Pham, 16 A.3d at 661; Khrapunskiy, 909 N.E.2d at 77; cf. Sudomir v.

McMahon, 767 F.2d 1456, 1465-66 (9th Cir. 1985).  Because Maine was not obligated to extend equivalent state-funded benefits to the appellants in the first place, it follows that the termination of those benefits does not violate the Equal Protection Clause.  See Pimentel, 670 F.3d at 1109-10; Hong Pham, 16 A.3d at 661.

As a last stand, the appellants rely on Graham's proclamation that Congress "does not have the power to authorize the individual States to violate the Equal Protection Clause."  403 U.S. at 382.  More specifically, they contend that "[t]he Commissioner cannot seek shelter for her equal protection violation in Congress's enactment of PRWORA" because PRWORA did not "create a national uniform immigration policy with respect to access to medical care," and instead left "the decision of whether to provide medical assistance for medically indigent non-citizens who have been in the country less than five years to the individual states." However, as we have explained above, the appellants' argument rests on the assumption that a state's mere participation in Medicaid, subject to PRWORA's mandatory eligibility restrictions, represents alienage-based discrimination.  Because we conclude that the state drew no distinctions on the basis of alienage, Graham's proscription does not apply here, and we therefore need not reach

-20-

the question of whether Maine acted in accordance with uniform federal policy.[3]

In short, the disparate treatment challenged by the appellants is not attributable to legislation enacted by the state of Maine. Instead, the appellants are experiencing the impact of a congressional decision -- PRWORA's mandatory five-year residency requirement -- restricting their eligibility for public welfare benefits, including federal-state cooperative programs such as Medicaid. As a result, there is no class of similarly situated citizens with whom the appellants can be compared vis-à-vis the state of Maine. We therefore conclude that the appellants' equal protection claim fails on the merits and that the district court properly denied the appellants' request for a preliminary injunction.

## C.    Dismissal

One final task remains. The Commissioner requests that we remand and order the district court to dismiss this case outright. The request is a sound one. We may remand a case for dismissal after reviewing a district court's preliminary injunction

---

[3]Even assuming arguendo that Maine discriminated on the basis of alienage in declining to extend state-funded benefits to PRWORA-ineligible aliens, we question whether the state's action would in fact run afoul of Graham. We need not decide the question today, but we note that both the Ninth and Tenth Circuits have held that PRWORA represents a uniform federal policy such that a state's exercise of its discretion under 8 U.S.C. §§ 1612(b) and 1622(a) garners only rational basis review under Plyler. See Korab, 2014 WL 1302614, at *8; Soskin, 353 F.3d at 1255.

order, see First Med. Health Plan, Inc. v. Vega-Ramos, 479 F.3d 46, 50-51 (1st Cir. 2007), and we do so here.

In order to survive a motion to dismiss, a complaint "must provide fair notice to the defendants and state a facially plausible legal claim." Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011). "Non-conclusory factual allegations in the complaint must [] be treated as true, even if seemingly incredible," id., but a court is "'not bound to accept as true a legal conclusion couched as a factual allegation,'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

In its order denying without prejudice the Commissioner's motion to dismiss for failure to state a claim, the district court was decidedly skeptical as to the merits of the appellants' equal protection claim, and allowed the case to go forward "despite some misgivings." Bruns v. Mayhew, No. 12-131, 2012 WL 5874812, at *13 (D. Me. Nov. 20, 2012). Nevertheless, the district court felt constrained by the deferential pleading standard and found "the line between factual allegation and legal conclusion [] too murky for a clean and decisive resolution," because in its opinion the question of whether Maine operated separate medical benefits programs appeared to be "a factual issue." Id. at *9, *13.

In opposing dismissal, the appellants agree with the district court's reasoning and also point to the Ninth Circuit's

analysis in Pimentel, which looked to the "the statutory scheme, source of funding, extent of state involvement, and history" to determine whether recipients of state-funded food assistance were similarly situated to federal SNAP recipients.  670 F.3d at 1108.  The appellants err, however, in framing Pimentel's analysis as a "factual inquiry."  The Pimentel court focused almost exclusively on the legal contours of the federal and state food assistance programs, and not at all on the plaintiffs' factual allegations regarding the administration and appearance of the programs.  Indeed, the court explicitly stated, "The statutory scheme establishes that the SNAP program is federal."  Id. (emphasis added).

Likewise, both the appellants' underlying complaint and our own analysis in this case are grounded in law rather than fact.  The appellants set forth Maine's purportedly unconstitutional legislative actions in a section of their complaint titled "Statutory Framework," separate from the "Factual Allegations" section describing the individual appellants' medical conditions and denial of benefits.  That section is rife with legal conclusions, stating inter alia that "PRWORA did not prescribe a uniform rule for the treatment of aliens"; that "[a]lthough MaineCare benefits for [PRWORA-ineligible] non-citizens were exclusively state-funded while United States citizen benefits were jointly funded by the federal and state governments, this did not

create an independent state Medicaid program for lawful permanent residents in Maine"; and that the 2011 Legislation "den[ied] non-citizens lawfully residing in Maine full MaineCare coverage while allowing similarly situated United States citizens to retain those same MaineCare benefits."

In finding no equal protection violation in this case, we have taken as true the appellants' allegations that Maine's state-funded supplemental medical assistance benefits for PRWORA-ineligible aliens were jointly administered with, and outwardly indistinguishable from, the Medicaid benefits enjoyed by citizens and eligible aliens. We reject only their legal conclusions, which we are under no obligation to accept. See Twombly, 550 U.S. at 555.

The appellants alternatively suggest that even if strict scrutiny is unwarranted, dismissal is nevertheless inappropriate because they are entitled to discovery on the question of whether Maine's actions would violate the Equal Protection Clause under more deferential review. More specifically, they suggest that discovery may uncover evidence of a discriminatory animus against aliens, invalidating the state's action even under rational basis review. This argument is doubly flawed. First, as we have explained above, as a matter of law, Maine did not discriminate on the basis of alienage at all. Second, and more fundamentally, the appellants' underlying complaint does not allege discriminatory

-24-

animus on the part of the state, nor does it anywhere suggest that Maine's actions violated the Equal Protection Clause even under rational basis review.  The appellants therefore cannot salvage their complaint now by invoking such a claim for the first time. See Alicea v. Machete Music, No. 12-1548, 2014 WL 888909, at *6 (1st Cir. Mar. 7, 2014) ("The plaintiffs' failure to adequately raise this argument below dooms it on appeal."); Iverson v. City of Boston, 452 F.3d 94, 102 (1st Cir. 2006) ("[T]heories not squarely and timely raised in the trial court cannot be pursued for the first time on appeal.").

## III.

For the foregoing reasons, the appellants have failed to state a claim under the Equal Protection Clause.  We therefore **affirm** the district court's denial of a preliminary injunction and **remand** with instructions that the appellants' complaint be dismissed.