# United States Court of Appeals
## For the First Circuit

No. 19-1056

T. FORCHT DAGI, M.D.,

Plaintiff, Appellant,

v.

DELTA AIRLINES, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Howard, Chief Judge,
Thompson and Barron, Circuit Judges.

Henry Herrmann for appellant.
Christopher A. Duggan, with whom H. Reed Witherby, Pauline A.
Jauquet, and Smith Duggan Buell & Rufo LLP, were on brief, for
appellee.

June 2, 2020

**THOMPSON**, **Circuit Judge**.  When an airline passenger suffers "bodily injury . . . on board [an] aircraft or in the course of any of the operations of embarking or disembarking," his or her only legal recourse is to sue the airline for recovery under the Montreal Convention (a multilateral treaty -- more on that in a minute) that preempts any other local law claims the passenger could bring.  See Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999, S. Treaty Doc. No. 106-45 (2000) (the "Montreal Convention" or the "Convention"), ch. I, art. 1, §1; art. 17.  The Convention also requires that the passenger bring any such suit within two years of "the date of arrival at the destination, or from the date on which the aircraft ought to have arrived, or from the date on which the carriage stopped."  Id. at ch. III, art. 35, §1.

Appellant, Dr. T. Forcht Dagi, M.D. ("Dagi"), is one such passenger who, having missed the Montreal Convention's two-year deadline to sue for injury that occurred in connection with his 2015 Delta Airlines flight to London, wishes now to convince us that his injury actually occurred after his disembarkation and therefore outside the preemptive scope of the Montreal Convention, and is actionable under local law.  Our (legal and factual) crosscheck complete, we find that Dagi has failed to show that his injury did not begin inflight and therefore falls within the scope

- 2 -

of the Convention and is, as a result, time-barred. Seatbelts fastened with chairs in the upright position, we explain.

## BACKGROUND

Dagi, an American citizen and resident of Massachusetts, was a passenger on Delta Flight No. 63 that departed Boston's Logan Airport on March 30, 2015 and arrived at London's Heathrow Airport the next morning. As the plane was descending, Dagi was accused of stealing a crew member's bag. With Dagi's consent, the airlines searched Dagi's carry-on luggage, but came up dry. Later inflight the bag was found elsewhere on the plane, but Dagi was accused of having thrown the bag to the spot of discovery (presumably to avoid being caught). Upon landing, the airline prevented Dagi from deplaning until all other passengers had done so.

Quoting the relevant portions of Dagi's complaint:

- Once the Aircraft landed, the Attendant prevented the Plaintiff from leaving the Aircraft before the other passengers had done so.
- The Attendant on the Jetway directed the Delta Ground Employee to detain the Plaintiff and to turn him over to the "authorities."
- Thereafter, accordingly, prior to the Plaintiff having disembarked from the Jetway, the Attendant ordered the Plaintiff to "follow that woman" and to "not go anywhere else."
- The Attendant had transferred custody of the Plaintiff to Delta Ground Employee, who ordered the Plaintiff to follow her away off the Jetway to another location in the terminal to wait "until the police arrived."
- Thereupon, the Plaintiff was marched, under duress, to another location in the terminal (the "Second Location"). This involved a walk

- 3 -

of ten to fifteen minutes duration to a distance of approximately four hundred yards from the Aircraft and Jetway.

- The Plaintiff, who is older, had at that time not fully recovered from leg surgery. He was forced to carry and move his two pieces of carry on luggage with no help. Accordingly, he was callously and unnecessarily subjected by Delta to significant pain and discomfort, exhaustion, and dangerous stress.

- The Plaintiff, at the Second Location, was kept standing and was not afforded an opportunity to sit down.

- After being detained at the Second Location for approximately fifteen minutes, the Plaintiff, without receiving any explanation, was marched, under duress, for ten to fifteen minutes, limping all the way back to the terminal in the vicinity of the Aircraft.

- Again, it was readily apparent that the Plaintiff, in being marched back to the Aircraft, was limping in pain, and was labored in carrying and moving luggage.

- Upon arriving back at the vicinity of the Aircraft, Delta Ground Employee turned over custody of the Plaintiff to a Delta employee identified as a "Delta supervisor."

- At this time, the Plaintiff again denied the accusations against him, and demanded to either be released or to speak to the police. In response, he was told that he was not allowed to leave.

- During the entirety of Plaintiff's detention by Delta, its personnel adamantly refused to respond to any of Plaintiff's reasonable questions, such as, without limitation: "Where are you taking me?"; "Have the police really been called?"; ["]What happens next?"; ["]How long will I be held here?"; and "Why am I being marched back to the plane?"

- The Plaintiff, once again, was kept standing and was not afforded an opportunity to sit down while waiting at the second location.

- Thereafter, in the terminal near the Aircraft, the Delta Supervisor detained the Plaintiff

for a considerable amount of time, and held several telephone conversations.

- The caller was a British police officer, who, after interviewing the Plaintiff, told the Plaintiff he was free to go and ordered his immediate release.
- The Plaintiff thereafter departed by passing through British immigration and customs, which are not a function of Delta Airlines.

The British police officer who ordered Dagi's release suggested to him that he file a complaint against Delta. The entire incident, from landing to Dagi's procession towards immigration and customs, lasted at least one hour.

Dagi had no further interaction with Delta until March 28, 2018 -- almost three years after his ill-fated flight -- when he packaged his ordeal into a suit filed against Delta in Massachusetts Superior Court in Middlesex County, alleging Delta had falsely arrested and wrongfully imprisoned him. On July 10, 2018, Delta removed the action to the United States District Court for the District of Massachusetts; Dagi filed his Amended Complaint there on July 13, 2018.[1]

Delta moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that 1) the Montreal Convention exclusively governed Dagi's alleged injury because it "[b]egan on the [p]lane and [c]ontinued [w]hile [d]isembarking,"

---

[1] We will refer to this as Dagi's complaint. See Amended Compl., Dagi v. Delta (No. 18-CV-11432-DPW) (D. Mass. July 13, 2018).

- 5 -

as defined by the First Circuit in McCarthy v. Northwest Airlines, Inc., 56 F.3d 313 (1st Cir. 1995),[2] through an "unbroken string of events," thereby preempting Dagi's local[3] law claims; and 2) because the statute of limitations under the Convention had already expired, Dagi was out of luck, warranting the suit's dismissal.

In response, Dagi pivoted from the broad strokes in his complaint to narrowly focus on what he described as his injury at the Second Location, arguing that an application of the tripartite test from McCarthy there would render that injury to have occurred after he had "fully disembarked," and therefore outside the scope of the Convention and its statute of limitations. To that end, he additionally argued that the facts giving rise to this "fresh cause of action" at the Second Location substantiated, separately, a cause of action under British law for the "unlawful delay in surrendering him to the British police." Finally, he raised a public policy red flag, claiming that the district court should refrain from giving Delta's "control" over him -- one of the test's factors -- determinative effect, since the "control" Delta had at

_____

[2] It is left to the courts to determine whether an injury occurred during "disembarkation" under the Convention. McCarthy, 56 F.3d at 316-17 (adopting a tripartite test to determine whether an injury occurs "in the course of any of the operations of embarking or disembarking"). In making such a determination, McCarthy instructs courts to examine "(1) the passenger's activity at the time of injury, (2) his or her whereabouts when injured, and (3) the extent to which the carrier was exercising control at the moment of injury." Id.

[3] We use "local" instead of "state" because Dagi's complaint alleges injury under both Massachusetts and British law.

- 6 -

the Second Location was "unlawful," and not the type contemplated by the Convention. Preempting this type of action under the Montreal Convention, he stressed, would lead to the "pernicious" result of giving airlines the unchecked ability to indefinitely detain passengers.

After considering all arguments, the district court agreed with Delta and dismissed Dagi's case, concluding that the Montreal Convention preempted and time-barred Dagi's claims. See Dagi v. Delta Air Lines, Inc., 352 F. Supp. 3d 116, 125 (D. Mass. 2018). In doing so, it applied this circuit's McCarthy test and explained that 1) Dagi's location, 2) his activity, and 3) Delta's control over Dagi, all begged the conclusion that Dagi was disembarking at all times during his false imprisonment. Id. at 124-25. "[T]he relevant events began on and continued seamlessly at Delta's direction directly from the aircraft and then back to its vicinity during the process of disembarkation," "in an unbroken chain until the [British Police] terminated the airline's direction and control." Id. at 121. According to the district court, "Dagi's effort to transmute his claims into more than one cause of action [pre- and post-Second Location] . . . distorts beyond recognition the gravamen of the single tort by a single defendant alleged" in the complaint. Id. at 121 n.4. Continuing, it declined to adopt Dagi's definition of "control" as different from its ordinary meaning, and found that Dagi overstated any

"pernicious" result that might arise from doing so.  It added, in all likelihood, that Dagi's damages, had he timely filed suit, would have been more lucrative under the Montreal Convention than under the laws of Massachusetts or England.

Dagi now appeals the district court's decision.  Because we, like the district court, find Dagi's claims time-barred, we affirm.

### STANDARD OF REVIEW

This court reviews an appeal of a Rule 12(b)(6) dismissal de novo -- that is, with fresh eyes and no deference to the decision-making below.  Newman v. Krintzman, 723 F.3d 308, 309 (1st Cir. 2013); Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012).  In doing so, we look to the complaint and draw all inferences in favor of the plaintiff-appellant.  Abdallah v. Bain Capital LLC, 752 F.3d 114, 117 (1st Cir. 2014).  Although "a complaint does not need 'detailed factual allegations' to survive a motion to dismiss, a plaintiff's factual allegations 'must be enough to raise a right to relief above the speculative level.'"  Gorelik v. Costin, 605 F.3d 118, 121 (1st Cir. 2010) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  If the plaintiff adequately pleads his claim for relief, he "receives the benefit of imagination, so long as the hypotheses are consistent with the complaint."  Twombly, 550 U.S. at 563 (citation omitted).

- 8 -

When the district court's dismissal is based on expiry of a statute of limitations, this court "will affirm when the pleader's allegations 'leave no doubt that an asserted claim is time-barred.'"  Gorelik, 605 F.3d at 121 (quoting LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 509 (1st Cir. 1998)).

Moreover, we "may affirm on any basis made manifest by the record."  See Matalon v. Hynnes, 806 F.3d 627, 632 (1st Cir. 2015) (citing Peguero-Moronta v. Santiago, 464 F.3d 29, 34 (1st Cir. 2006) and InterGen N.V. v. Grina, 344 F.3d 134, 141 (1st Cir. 2003)).

## ANALYSIS

The Montreal Convention[4] is a multilateral treaty, to which the United States and the United Kingdom are signatories,[5] which governs international travel and limits liability for carriers such as appellee Delta Airlines.  See Convention, ch. I, art. 1, §1; ch. III, art. 17.  If an action for damages falls

---

[4] The Montreal Convention superseded the Warsaw Convention, The Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934).  As a result, courts rely on case law arising from the Warsaw Convention in interpreting the Montreal Convention when the provisions of the two Conventions are essentially the same.  See, e.g., Narayanan v. British Airways, 747 F.3d 1125, 1127 n.2 (9th Cir. 2014).

[5] The United States Senate ratified this treaty on July 31, 2003.  See 149 Cong. Rec. S10,870 (daily ed. July 31, 2003). It entered into force in the United States on November 4, 2003, and in the United Kingdom on June 28, 2004.  See Baah v. Virgin Atlantic Airways Ltd., 473 F. Supp. 2d 591, 593 n.5 (S.D.N.Y. 2007).

within one of the Convention's damages provisions, then the treaty provides the sole avenue for relief -- that is, the Montreal Convention preempts all local claims that fall within its scope, even if the claims are not cognizable (i.e., even if they do not satisfy the conditions for liability) under the Convention. See El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 161 (1999).

Under Article 17, and as relevant to our facts here, a carrier is strictly liable for damages sustained when an "accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking." Convention, art. 17. To allege an "accident," the claim must allege an occurrence which "arises from some inappropriate or unintended happenstance in the operation of the aircraft or airline." Fishman v. Delta Air Lines, Inc., 132 F.3d 138, 143 (2d Cir. 1998). Additionally, a carrier's Article 17 liability is triggered only when "a passenger's injury is caused by an unexpected or unusual event or happening that is external to the passenger" as the "Convention does not cover claim[s] for personal injuries not arising from an accident." Id. at 141 (quoting Air France v. Saks, 470 U.S. 392, 405 (1985) and citing Tseng v. El Al Israel Airlines, Ltd., 122 F.3d 99, 103 (2d Cir. 1997), rev'd on other grounds, 525 U.S. 155 (1999)). And as we've mentioned, plaintiffs seeking to recover damages under the

- 10 -

Montreal Convention must bring their claims within two years of "the date of arrival at the destination, or from the date on which the aircraft ought to have arrived, or from the date on which the carriage stopped."  Convention at ch. III, art. 35, §1.

**Our Take**

On appeal, Dagi presses the same claims he advanced below.  After careful review, we arrive at the same destination as the district court, but by a different flightpath.  Rather than delving into what of Dagi's story constitutes "disembarkation," we back up and examine the nature of the accident Dagi alleges -- false imprisonment.  Interestingly, both litigants agree that false imprisonment falls within the purview of the continuous tort doctrine and each argues that this classification favors their respective position.  However, because we find that Dagi's argument relies on a construction of the tort that we do not find persuasive, he presents us with no basis to conclude that the conduct at issue does not fall within the confines of the Montreal Convention.  We thus start and stop the inquiry there.[6]

---

[6] Now, had Dagi *pleaded* that his false imprisonment started only at the Second Location, we would have been required to apply the McCarthy test to determine whether his activity, location, and Delta's control over him there amounted to disembarkation.  McCarthy, 56 F.3d at 316-17.  But as you'll soon see, Dagi's complaint counsels otherwise.  Similarly, had Dagi raised other arguments for why the tort did not fall within the confines of the Montreal Convention, we may have been required to apply the McCarthy test.  But, again, Dagi raised only the "fresh cause of action" argument to us.

### The Accident

The parties do not dispute *that* an "accident" occurred: false imprisonment.[7]  What they dispute is *when* it began.  Dagi concedes that certain parts of his story occurred within the Convention's scope and are therefore preempted and time-barred: anything that happened aboard Flight No. 63, on the jetway leaving the plane, and for the time he was being "marched" from the jetway to the Second Location.  In that vein, he points out that he made "no pleading whatsoever that [he], during flight, was 'held,' or restricted in his movements in any fashion as a passenger on [the] Aircraft."  Rather, it's at the Second Location where his actionable false imprisonment started. Contending that because "wrongful imprisonment is a continuing tort," "each moment of such [alleged] post-disembarkation detention" -- that is, each moment after arrival to the Second Location that he remained detained -- "constituted a continuous <u>new</u> tort and a 'fresh cause of action' not preempted by the Convention."  (Emphasis in original.)  As he tells it, once he was far enough away and enough time had passed at the Second Location, new causes of action matured and became actionable under local law.  Moreover, he repeats his control-is-

_____

[7] Dagi alleges both false arrest and false imprisonment by Delta.  But as "the former is a species of the latter," <u>Wallace</u> v. <u>Kato</u>, 549 U.S. 384, 388 (2007), we refer to both claims when we speak of false imprisonment.  <u>See also</u> <u>Nuon</u> v. <u>City of Lowell</u>, 768 F. Supp. 2d 323, 336 (D. Mass. 2011); J. Clerk & W. Lindsell, <u>The Law of Torts</u>, ch. 15 § 5 (22d ed. 2018) ("An unlawful arrest is a false imprisonment.").

not-control argument, urging that the "unlawful" control Delta exercised over him at the Second Location was distinct, and not the type of control "contemplated" by the Convention. Rather, he contends, the definition of "control" when analyzing "disembarkation" under the Convention relates to "the control of an airline in the ordinary course of events," and differs from the "control" exerted in the false imprisonment context.[8]

Delta responds, as before, that such slicing and dicing of a continuous tort like false imprisonment is impermissible, and that the accident that led to Dagi's injury of false imprisonment began on the airplane, as explained in Dagi's own words (in his pleading): "[o]nce the Aircraft landed, [Delta's] Attendant *prevented [Dagi] from leaving the Aircraft* before the other passengers had done so." So Delta argues that because the "accident which caused the . . . injury took place on board the aircraft," Convention, art. 17, and continued uninterrupted until Dagi left of his own accord for immigration and customs, the Convention covers the accident and preempts any recovery under local law for the resultant injury.

We take off with the basics. In general, and as the Supreme Court has noted, false imprisonment involves taking a

---

[8] Dagi also spends many pages arguing on appeal that the district court erred in its analysis of the different damages provisions under Massachusetts and British law. Because we find Dagi's local law claims preempted, we bypass this issue.

person into custody: "[e]very confinement of the person is an imprisonment, whether it be in a common prison or in a private house, or in the stocks, or even by forcibly detaining one in the public streets; and when a man is lawfully in a house, it is imprisonment to prevent him from leaving the room in which he is." Wallace v. Kato, 549 U.S. 384, 388-89 (2007) (quoting M. Newell, Law of Malicious Prosecution, False Imprisonment, and Abuse of Legal Process § 2, p. 57 (1892)). Turning to Massachusetts law which Dagi invokes, "[f]alse imprisonment consists of '(1) intentional and (2) unjustified (3) confinement of a person, (4) directly or indirectly (5) of which the person confined is conscious or is harmed by such confinement.'" Sietins v. Joseph, 238 F. Supp. 2d 366, 381 (D. Mass. 2003) (citation omitted); see Restatement (Second) of Torts § 35 (1965). The analysis under British law is substantially the same. See J. Clerk & W. Lindsell, The Law of Torts, ch. 15 § 5 (22d ed. 2018) ("False imprisonment is 'the unlawful imposition of constraint on another's freedom of movement from a particular place.' The tort is established on proof of: (1) the fact of imprisonment; and (2) the absence of lawful authority to justify that imprisonment." (quoting Collins v. Wilcock [1984] 1 W.L.R. 1172)).

We have previously found false imprisonment to be a continuing tort[9] under Massachusetts common law, see Santiago v. Fenton, 891 F.2d 373, 383 n.3 (1st Cir. 1989) (citing Wax v. McGrath, 255 Mass. 340, 151 N.E. 317 (1926)); see also Noel v. Town of Plymouth, Mass., 895 F. Supp. 346, 354 (D. Mass. 1995),[10] and to qualify as such "there must be recurring [tortious] or unlawful conduct[;] a continuing tort is not established by the continuation of harm caused by previous but terminated tortious or unlawful conduct." Tomaselli v. Beaulieu, 967 F. Supp. 2d 423,

_____

[9] The idea behind the continuing tort doctrine is that if a tort began outside a limitations period but continued into it, redress may be available for injuries caused by actions that would otherwise have been barred by the statute of limitations. See, e.g., 54 C.J.S. Limitations of Actions § 222.

[10] But cf. Bettencourt v. Town of Mendon, 334 F. Supp. 3d 468, 492 (D. Mass. 2018) ("The continuing tort doctrine has been applied to a limited number of torts in Massachusetts, and it is not clear that [a] Massachusetts court would apply it to a false imprisonment claim." (citation omitted)). There is also British authority that places false imprisonment into the category of "[t]orts actionable per se," whose "cause of action accrues upon the commission of the wrong," as opposed to "[c]ontinuing torts (such as a continuing trespass to land or continuing breach of statutory duty)," where "a fresh cause of action accrues every day, but the right of action is restricted to that part of the wrong committed in the past six years." O'Hara v. ACC Bank Plc [2011] IEHC 367; [2012] P.N.L.R. 3 (Eng.). But for our purposes here, this is a distinction without a difference: even if we were to consider the cause of action of Dagi's false imprisonment to have "accrue[d] upon the commission of the wrong," id., Dagi gives us no reason to find that the wrong was not "committed" on the just-landed plane, when he was first prevented from leaving Delta's custody. And since neither party has fleshed out the concept of false imprisonment as a continuous tort (or not) under British Law, "we refrain from [further] delving into the issue without the benefit of either briefing or developed argumentation." Pollard v. Law Office of Mandy L. Spaulding, 766 F.3d 98, 103 n.3 (1st Cir. 2014).

443 (D. Mass. 2013), aff'd (Dec. 16, 2014) (internal quotations and citation omitted). And we look to the recurring nature of the tort to determine its endpoint, which triggers the running of the statute of limitations. See Maslauskas v. United States, 583 F. Supp. 349, 351 (D. Mass. 1984). Applying this to false imprisonment, we find that "[f]alse imprisonment ends, as affecting recovery" and triggering the statute of limitations, "when the release of the plaintiff's person occurs under reasonable circumstances." 35 C.J.S. False Imprisonment § 84; see also Wallace, 549 U.S. at 389 ("false imprisonment is subject to a distinctive rule[] dictated, perhaps, by the reality that the victim may not be able to sue while he is still imprisoned: '[l]imitations begin to run against an action for false imprisonment when the alleged false imprisonment ends.'") (citing 2 H. Wood, Limitation of Actions § 187d(4), p. 878 (rev. 4th ed. 1916); 4 Restatement (Second) of Torts § 899, cmt. c (1977); A. Underhill, Principles of Law of Torts 202 (1881)); Decarvalho v. McKeon, No. CV 17-11224, 2019 WL 569829, at *2 (D. Mass. Feb. 12, 2019) ("For a claim of false imprisonment, the date of accrual is 'when the alleged false imprisonment ends.'" (citation omitted)).

Dagi seems to think that false imprisonment's characterization as a continuous tort alone supports his contention that a newly actionable, "fresh cause of action" arises moment to moment and therefore what happened at the Second Location

- 16 -

until his release would evade the Montreal Convention's scope.[11] But Dagi provides us with no authority (and we have found none) under Massachusetts law or otherwise of a single instance wherein the continuous tort of false imprisonment has been divided into multiple claims or has been found to give rise to segmented "fresh cause[s] of action," such that each is separately actionable. After all, "[f]or false imprisonment, the statute [of limitations] begins to run only when the imprisonment ends," because "*the period of imprisonment is treated as a unit*." Restatement (Second) of Torts § 899, cmt. c (1979) (emphasis added). In other words, as this tort is defined, liability is measured by the entire unit of unjustifiable confinement from seizure to either release or placement in legal process. See Wallace, 549 U.S. at 389-90 ("If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more." (quoting W. Keeton et al., Prosser and Keeton on Law of Torts § 118, at 888 (5th ed. 1984) and citing Heck v. Humphrey, 512 U.S. 477, 484 (1994)); 35 C.J.S. False Imprisonment § 84; see also Wilson v. Town of Fairhaven, No. CV 18-11099-PBS, 2019 WL

---

[11] Dagi explains: "Since wrongful imprisonment is a continuing tort, and a continuing cause of action, and since Dr. Dagi was wrongfully imprisoned by Delta subsequent to his disembarkation, that duration of his detention did not constitute mere harm or damage resulting from a pre-disembarkation tort by Delta; rather, each moment of such post-disembarkation detention constituted a continuous new tort and a 'fresh cause of action' not preempted by the Convention, and therefore actionable under local law."

1757780, at *10 (D. Mass. Mar. 4, 2019), R. & R. adopted, No. 1:18-CV-11099, 2019 WL 1760591, at *10 (D. Mass. Mar. 19, 2019) (citing Wallace, 549 U.S. at 389); Decarvalho, 2019 WL 569829, at *2; Williams v. City of Boston, 771 F. Supp. 2d 190, 201 (D. Mass. 2011); Gore v. Walpole (1866) 176 Eng. Rep. 751, 752, n.1; 4 Foster and Finlason 694, 696, n.1 (Eng.) (explaining that liability "for defendant's wrongful arrest or imprisonment" ends when the defendant is taken into lawful custody). Accordingly, because Article 17 covers claims that "allege an 'accident' if it arises from some inappropriate or unintended happenstance in the operation of the aircraft or airlines," Fishman, 132 F.3d at 143, and because the only argument that Dagi has raised for why we may not look to where the tort began is one that we have rejected, we conclude that the Montreal Convention embraces Dagi's false imprisonment claim when the tort is properly understood.[12] The

---

[12] Dagi also argues that what he pleaded in his complaint as to the Second Location supplies enough ammo to violate, separately, British law's prohibition against an "unlawful delay in surrendering him to the British police," which, according to Dagi, had "no direct relevance as to [his] purported transgression on the Aircraft." Dagi misses, however, that this alleged British tort occurred entirely during Dagi's false imprisonment that spanned his time on the airplane to when he left for immigration and customs. Therefore, because we find his false imprisonment preempted, we find too that any other injury that took place during his false imprisonment, such as Delta's alleged "delay in surrendering [Dagi] to the British police," is also preempted under the Montreal Convention. See Tseng, 525 U.S. at 161 (1999) (holding "that recovery for a personal injury suffered 'on board [an] aircraft or in the course of any of the operations of

- 18 -

fact that Dagi remained in Delta's control at and beyond the Second Location does not disassociate his cause of action from its point of origin.[13]   Indeed, Dagi's complaint itself connects the dots:

> [T]he unlawful imprisonment of [Dagi] was a direct consequence of a false accusation against him by a Delta flight attendant during the flight, and this continuing tort of unlawful imprisonment began (prior to [Dagi's] disembarkation[14]) by said flight attendant instructing Delta ground personnel to detain [Dagi] prior to and subsequent to, his disembarkation at the London air terminal.[15]

---

embarking or disembarking,' . . . if not allowed under the Convention, is not available at all." (citation omitted)).

[13] In his complaint, Dagi relayed a saga that started aboard the plane and ended only when he was released to immigration and customs, and he only asked for damages in connection with "his unlawful imprisonment by Delta."   When confronted with Delta's motion to dismiss, Dagi tried, in his opposition and on appeal, to explain that the "different ground why Delta's detention was unlawful and actionable first arose in the terminal, and was based solely on Delta's actions [i.e., Delta's delay in surrendering Dagi to British police], *with no direct relevance as to Dr. Dagi's purported transgression on the Aircraft*." (Emphasis added.)   But arguing that his Second Location injury had "no direct relevance to [Dagi's] purported transgression on the Aircraft" does not make it so.   Reading Dagi's complaint to "assume the truth of all well-pleaded facts and indulge all reasonable inferences therefrom that fit the plaintiff's stated theory of liability," Arruda v. Sears, Roebuck & Co., 310 F.3d 13, 18 (1st Cir. 2002), we still find that Dagi's false imprisonment cannot be so segmented.

[14] Remember that Dagi's legal conclusion that his "disembarkation" ended once he was at the Second Location has no impact on our analysis.   See Bruns v. Mayhew, 750 F.3d 61, 71 (1st Cir. 2014) ("[A] court is 'not bound to accept as true a legal conclusion [in a complaint] couched as a factual allegation.'" (quoting Twombly, 550 U.S. at 555)).

[15] He does us a similar favor later in the complaint:

> During the *entire duration* of time in which [Dagi] was *confined and falsely imprisoned by the Attendant, by the Delta Ground Employee and by the Delta Supervisor*, [Dagi] believed

- 19 -

In an effort to give lift to his fresh cause of action theory, Dagi relies on two out-of-circuit cases in support of his view that his false imprisonment at the Second Location can be severed from what started on the plane. First Thede v. United Airlines, Inc., where a kerfuffle arising from Thede's repeated requests for food from the United staff before and during the delayed flight led the flight to be diverted to Belfast, Northern Ireland, where armed officers boarded the plane to remove Thede. Thede v. United Airlines, Inc., No. 17-CV-03528-PJH, 2018 WL 1569836, at *1 (N.D. Cal. Mar. 30, 2018), rev'd and remanded, 796 F. App'x 386 (9th Cir. 2020). "Based on the accusations of the flight crew, [Thede] was charged with assault and endangering an aircraft," remained on house arrest for ten months after landing, and after a seven-day trial, was found not guilty. Id. This string of events led Thede himself to bring suit against United for manifold reasons, including the one important for our purposes, malicious prosecution. Id. at *2. Thede's claim had rested on two sets of statements from United: first, those "made by the captain or flight crew during the flight or to officers when they were in or near the gate," Thede v. United Airlines, Inc., 796 F. App'x 386, 389 (9th Cir. 2020), and second, those "based on events that took place during and following [Thede's] ten-month confinement to

_____

that they had the legal authority to detain him and to physically restrain him if he attempted to leave. (Emphases added.)

- 20 -

house arrest while" awaiting trial. Id. The district court found Thede's claim for malicious prosecution "preempted by the Montreal Convention," Thede, 2018 WL 1569836, at *6, and for that Thede appealed. The Ninth Circuit reversed and remanded, holding that while Thede's malicious prosecution claim based on the first set of statements was preempted by the Convention, the allegations made in connection with the second set of statements were "spatially and temporally distinct from when Thede was" on the plane and, therefore, not preempted by the Convention. Thede, 796 F. App'x at 389.

Next, Elnajjar v. Northwest Airlines, Inc., where plaintiff's claims arose from allegedly hostile treatment by airline staff during check-in, aboard the plane, and when forcibly removed from the plane. No. 04-CV-680, 2005 WL 1949545, at *1-2 (S.D. Tex. Aug. 15, 2005). The district court found certain claims, such as negligence and conspiracy, that arose on the plane, preempted by the Warsaw Convention, but the claims of intentional infliction of emotional distress, invasion of privacy, and defamation arising from the encounter at check-in "not clearly preempted by [the Convention]." Id. at *3-4. The district court specifically found Elnajjar's false imprisonment claim, "based on incidents that occurred after [plaintiff] had fully disembarked,"

was not preempted.[16]  Id. at *4.  The district court read this allegation of the false imprisonment as starting after Elnajjar left the airplane into the airport, "some distance from the boarding area and entail[ing] the direction of law enforcement officials, not just Defendants' agent," and therefore outside the scope of the Convention.  Id.

These cases are of no help to Dagi.  Both allege a distinct injury connected to distinct events that took place outside the scope of the Convention:  in Thede, malicious prosecution based on statements made long after the flight's arrival and during Thede's ten-month house arrest, and in Elnajjar, false imprisonment that plaintiff alleged started once he was off the plane and marshalled by law enforcement.  In neither case was the allegation based on a continuous tort that began on the plane, and that the plaintiff tried to partition into distinct torts.  In contrast, Dagi's allegation of false imprisonment explicitly started "on board the aircraft," Convention, art. 17, by his own admission, and, as we have explained, there is no merit to his argument that a "fresh cause of action" arose at the Second Location.

---

[16] Elnajjar's complaint alleged that he "was removed, against his will, from the airplane by armed agents, Defendants and a combat soldier.  [He] was not allowed to leave the custody of the Defendants' agents at any time.  [He] was prevented from moving about the airport freely."  Compl. at ¶10, Elnajjar v. Northwest Airlines, Inc., No. 04-CV-680, 2005 WL 1949545 (S.D. Tex. 2004).

And so we arrive at our final destination. No need for a stopover to analyze if any part of Dagi's story happened "post-disembarkation" to dislodge it from the Convention's scope, because Dagi's false imprisonment was a continuing tort that started, by his own admission, on the plane and then continued uninterrupted, by the tenets of tort law, until Dagi was free to leave of his own accord for immigration and customs. We therefore find that, based on the arguments that he makes to us, any claim of injury that Dagi brought related to his false imprisonment falls solely within the scope of the Montreal Convention, and because Dagi filed his complaint almost a full year after the expiration of the Convention's two-year statute of limitations, we **affirm** the district court's dismissal of his complaint.[17]

Each side shall bear its own costs.

---

[17] We also dispose of Dagi's policy arguments, that: 1) permitting his injury to fall within the scope of the Montreal Convention would lead to a "pernicious" result, in that as long as an airline maintains control over a passenger, it could detain a passenger indefinitely and at whatever location it so pleases; and 2) such a "pernicious" result is all the more pronounced because absent a physical injury, such a detention by the airline would have no cognizable remedy under the Convention. Neither of these arguments hold water. First, he forgets that the passenger could always bring a cause of action under the Montreal Convention -- it would just have to be before the two-year deadline. Second, the Supreme Court in Tseng relied on the Convention's narrow scope to justify its holding that an injury may fall within the scope of the Convention for preemption purposes, but nonetheless receive no remedy under it. See Tseng, 525 U.S. at 171-72 (explaining that "the Convention addresses and concerns, *only and exclusively*, the airline's liability for passenger injuries occurring 'on board the aircraft or in the course of any of the operations of embarking or disembarking.'" (quoting Convention, art. 17) (emphasis added)).