# United States Court of Appeals
## For the First Circuit

No. 21-1037

JENNIFER MOORE,

Plaintiff, Appellant,

v.

BRITISH AIRWAYS PLC, a foreign corporation,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark G. Mastroianni, U.S. District Judge]

Before

Kayatta, Selya, and Howard,
Circuit Judges.

Kevin Chrisanthopoulos for appellant.
Marissa N. Lefland, with whom Anthony U. Battista, Samantha
M. Holloway, and Condon & Forsyth LLP were on brief, for appellee.

April 29, 2022

**SELYA**, <u>Circuit Judge</u>. We have noted before that "words are like chameleons; they frequently have different shades of meaning depending upon the circumstances." <u>United States</u> v. <u>Romain</u>, 393 F.3d 63, 74 (1st Cir. 2004). This appeal turns on just such an exercise in exegesis — the meaning of the word "accident," as that word is used in Article 17(1) of the Montreal Convention, formally known as the Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999, S. Treaty Doc. No. 106-45 (2000), 2242 U.N.T.S. 350.

This case has its genesis in an airline passenger's fall while disembarking from an aircraft by means of a mobile staircase, the last step of which was appreciably more precipitous than the earlier ones. The principal question on appeal is whether the use of such a staircase, under the circumstances, was an event that may constitute an "accident" within the meaning of the Montreal Convention. Concluding, as we do, that a jury could supportably find that the event was unexpected and that the passenger's injuries resulted from such an accident, we vacate the district court's entry of summary judgment for the airline, affirm its denial of the passenger's motion for partial summary judgment, and remand for further proceedings.

**I**

We briefly rehearse the relevant facts (which are largely undisputed) and the travel of the case. On September 14,

2018, the plaintiff, Jennifer Moore, flew from Boston to London aboard a Boeing 777 airliner operated by the defendant, British Airways PLC. The red-eye flight touched down at London's Heathrow Airport at around 9:00 a.m. on September 15. While taxiing to the gate, the flight crew learned that the jet bridge ordinarily used to disembark passengers was inoperable. Consequently, deplaning passengers would need to use a mobile staircase (an apparatus commonly used at Heathrow and other airports of comparable scale and scope).

After the aircraft was parked at the gate, the ground crew secured the mobile staircase against the fuselage. The passengers — including the plaintiff and her travel companion, Tammy Burnett — then began to disembark. By all accounts, the disembarkation process was calm and orderly. The passengers proceeded down the staircase in single file without any noticeable jostling or other untoward behavior. The stairs were clean — free of debris and other foreign substances — and the weather was clear.

Ms. Burnett preceded the plaintiff down the mobile staircase. As Ms. Burnett testified in her deposition, she "was surprised at the last step being a little further than a normal cadence of a staircase" and, thus, "the bottom step didn't arrive when I thought it would." She nonetheless kept her balance and then "turned around to tell [the plaintiff] to watch her step," only to discover that the plaintiff had taken a tumble. In

describing her fall, the plaintiff testified that when she reached the last step "it was further down than I was expecting," which "thr[ew] off my balance and both of my ankles turned and I went down."

There were no British Airways employees at the bottom of the stairs and no one warned the passengers about the height of the final step. After the plaintiff fell — and in accordance with British Airways' internal policy — the mobile staircase was taken out of service and inspected for defects. The inspection confirmed that the stairs were in their normal operating condition, free of defects and working as intended at the time of the incident. The inspection also confirmed that the distance from the bottom step to the ground was "noticeably slightly different" than the distance between the steps themselves.

The plaintiff's expert, Chad Phillips, prepared a report estimating from photographs that the riser height of each step on the mobile staircase was 7.4 inches, whereas the riser height of the bottom step (the distance between that step and the ground) was 13 inches. In his opinion, "this excessive riser [height] difference exposed [the plaintiff] to a misstep hazard and caused her to take an air step resulting in her injuries." An "air step," he explained, occurs by stepping "onto an unexpected depression or step down."

Phillips further opined that the mobile staircase was used in a manner that did not conform to industry standards. In this regard, he referred to British Standard 5395-1:2000, which states that "[t]he maximum rise that people can be expected to negotiate safely is 220mm," or 8.7 inches. He also referred to European Standard EN 12312-1:2001+A1:2009, entitled "Aircraft Ground Support Equipment - Specific Requirements - Part 1: Passenger Stairs," which provides that "[a]ll steps of a stair flight shall be designed with the same riser height" and that the distance from the ground to the tread surface of the bottom step "shall not exceed 260mm," or 10.24 inches.

The plaintiff sustained severe injuries as a result of her fall. Accordingly, she sued British Airways under the Montreal Convention for damages in an unspecified amount (her complaint contained no specific ad damnum, but sought recovery "in excess of the jurisdictional limits of [the district court]"). She alleged, in substance, that the injuries sustained in her fall resulted from an accident within the meaning of Article 17(1) of the Montreal Convention.[1]

---

[1] Her complaint also contained a common law claim for negligence. The district court dismissed this claim as preempted by the Montreal Convention, see Moore v. British Airways PLC, 511 F. Supp. 3d 1, 6 (D. Mass. 2020), and the plaintiff has not appealed that ruling. Thus, we make no further mention of this claim.

After pretrial discovery had run its course, British Airways moved for summary judgment. See Fed. R. Civ. P. 56(a). It argued that, as a matter of law, the plaintiff's injuries did not result from an accident within the meaning of the Montreal Convention. The plaintiff opposed the motion and cross-moved for partial summary judgment on the issue of whether her injuries stemmed from such an accident. Following a hearing, the district court granted British Airways' motion for summary judgment and denied the plaintiff's cross-motion. See Moore v. British Airways PLC, 511 F. Supp. 3d 1, 2-3, 7 (D. Mass. 2020). In so ruling, the court determined that the plaintiff's injuries were not the result of an accident within the meaning of the Montreal Convention. See id. at 6-7. This timely appeal ensued.

## II

It is by now apodictic that orders granting summary judgment engender de novo review. See Finamore v. Miglionico, 15 F.4th 52, 58 (1st Cir. 2021). In conducting this tamisage, we assess "the record and all reasonable inferences therefrom in the light most hospitable to the summary judgment loser" (here, the plaintiff). Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999). Summary judgment is appropriate only when the record, so viewed, "reflects no genuine issue as to any material fact" and the movant demonstrates an entitlement to

- 6 -

judgment as a matter of law. Morelli v. Webster, 552 F.3d 12, 18 (1st Cir. 2009); see Fed. R. Civ. P. 56(a).

If the nonmovant bears the ultimate burden of proof on a given issue, "she cannot rely on an absence of competent evidence" alone to show that the issue is trialworthy. McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995). Instead, she "must present definite, competent evidence sufficient to establish the elements of [her] claim in order to survive a motion for summary judgment." Alston v. Int'l Ass'n of Firefighters, Local 950, 998 F.3d 11, 24 (1st Cir. 2021) (internal quotation omitted) (quoting Pina v. Children's Place, 740 F.3d 785, 795-96 (1st Cir. 2014)).

**A**

The Montreal Convention is a multilateral treaty governing the liability of air carriers for certain injuries and damages that occur during international air carriage. See Dagi v. Delta Airlines, Inc., 961 F.3d 22, 27 (1st Cir. 2020). The United States and the United Kingdom are among the signatories to the Convention. See id.

The Montreal Convention establishes a two-tiered liability regime for passenger injuries caused by an accident. The carrier is strictly liable for damages up to 128,821 Special Drawing Rights, an amount determined by the International Monetary Fund that is approximately $175,000. See Montreal Convention,

arts. 21(1), 23; Inflation Adjustments to Liability Limits Governed by the Montreal Convention Effective December 28, 2019, 85 Fed. Reg. 3104, 3105 (Jan. 17, 2020); International Monetary Fund, SDR Valuation, https://www.imf.org/external/np/fin/data/rms_sdrv.aspx (last visited April 28, 2022). For damages over that ceiling, a carrier can avoid liability if it can prove that "such damage was not due to the negligence or other wrongful act or omission of the carrier" or that "such damage was solely due to the negligence or other wrongful act or omission of a third party." Montreal Convention, art. 21(2). What is more, the carrier may reduce or eliminate its liability for all damages to the extent it "proves that the damage was caused or contributed to by the negligence or other wrongful act or omission of the person claiming compensation." Id., art. 20.

The Montreal Convention has preemptive force with respect to passenger injuries suffered either on board an aircraft or during embarkation or disembarkation. Recovery for such a claim, "if not allowed under the Convention, is not available at all" under a nation's local laws. El Al Israel Airlines, Ltd. v. Tseng, 525 U.S. 155, 161 (1999) (interpreting Warsaw Convention); see Dagi, 961 F.3d at 24, 27-28 (same for Montreal Convention).

The case at hand turns on Article 17(1) of the Convention, which provides in full: "The carrier is liable for damage sustained in case of death or bodily injury of a passenger

- 8 -

upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking."  To recover under this provision, the plaintiff must show that an "accident" occurred, which proximately caused a passenger's death or injury (either physical or having a physical manifestation) and which took place either on board the aircraft or while embarking or disembarking.  See Acevedo-Reinoso v. Iberia Líneas Aéreas de España S.A., 449 F.3d 7, 12 (1st Cir. 2006).[2]  The plaintiff is not required to show that her injuries resulted from any negligence on the air carrier's part.

Here, only the first element of the required showing — the existence of an "accident" — is at issue.  The Montreal Convention does not define the word "accident," but it is used in Article 17(1) as a term of art.  In deciphering its meaning, the primary decryption tool available to us is the Supreme Court's opinion in Air France v. Saks, 470 U.S. 392 (1985).  There, the

---

[2] Although Acevedo-Reinoso and the case law on which it relied interpreted the Warsaw Convention of 1929 — which has now been superseded by the Montreal Convention — we have explained that a court may "rely on case law arising from the Warsaw Convention in interpreting the Montreal Convention when the provisions of the two Conventions are essentially the same." Dagi, 961 F.3d at 27 n.4.  Because Article 17(1) of the Montreal Convention is essentially the same as its Warsaw Convention counterpart, see id. at 27-28 (relying on case law interpreting Article 17 of the Warsaw Convention in construing Article 17(1) of the Montreal Convention), we treat relevant Warsaw Convention case law as authoritative here.

Court defined an "accident," for purposes of Article 17 of the Warsaw Convention (the predecessor of the Montreal Convention), as "an unexpected or unusual event or happening that is external to the passenger." Id. at 405. Conversely, an injury that "results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft" is not "caused by an accident" within the meaning of the Warsaw Convention. Id. at 406. Mindful of the ambiguities lurking in this formulation, the Saks Court appended two practical directions. First, it stressed that "[t]his definition should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries." Id. at 405. Second, it cautioned that "where there is contradictory evidence, it is for the trier of fact to decide whether an 'accident' as here defined caused the passenger's injury." Id.[3]

---

[3] In Dagi, the occurrence of an "accident" was not disputed. See 961 F.3d at 28. Nevertheless, we said that "[t]o allege an 'accident,' the claim must allege an occurrence which 'arises from some inappropriate or unintended happenstance in the operation of the aircraft or airline.'" Id. (quoting Fishman v. Delta Air Lines, Inc., 132 F.3d 138, 143 (2d Cir. 1998)). The court below read this dictum as if it imposed an "additional[]" test beyond the Saks formulation. Moore, 511 F. Supp. 3d at 5-6 & n.3. We reject this reading and disavow any intention of altering the Saks formulation. Dagi is best read as furnishing examples of occurrences that come within the Saks formulation. The same is true of Fishman, 132 F.3d at 143 (quoted in Dagi).

The plaintiff posits that her injuries were caused by an accident because it was unexpected that she would have to disembark from the aircraft on a mobile staircase in which the bottom step was 13 inches from the ground, even though the first twenty-odd steps each had a riser height of 7.4 inches and no warning was given about the bottom step's greater height.[4]  There is no dispute that deploying such a staircase was an event that was external to the passenger, as required by Saks.  The parties' only quarrel, therefore, is whether disembarking on a staircase constructed in this way should be considered "unexpected or unusual" under the circumstances.

The district court granted British Airways' motion for summary judgment because the plaintiff offered no "evidence that the height of the last step was unusual for mobile staircases" or that this design was "atypical from other mobile staircases used to disembark passengers." Moore, 511 F. Supp. 3d at 6-7.  At oral argument in this court, the plaintiff's counsel agreed that no such evidence has been identified. Consequently, summary judgment would be appropriate if the inquiry stopped there.  But it does not.

---

[4] The plaintiff does not argue that the event constituting the "accident" was either the fall itself or the jet bridge's malfunction. Accordingly, we deem any such arguments waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

The Saks formulation simply does not confine the inquiry to whether the event was unusual; it also requires the court to ask whether the event was unexpected.  Words often shadow-dance with each other, and "unusual" and "unexpected" are, admittedly, somewhat overlapping categories. But only somewhat.  For example, a solar eclipse is likely to be an unusual event — but if it is widely forecast by astronomers across the globe, it is likely to be expected.

Giving the constituent terms of the Saks formulation their "ordinary" meanings, Olympic Airways v. Husain, 540 U.S. 644, 655 (2004), we cannot say that these categories are entirely congruent.  The ordinary meaning of "unexpected" is "[c]oming without warning; unforeseen." American Heritage Dictionary 1950 (3d ed. 1992).  The Supreme Court has accentuated this established meaning of unexpected by glossing the Saks definition of accident as "an unforeseen event." Zicherman v. Korean Air Lines Co., 516 U.S. 217, 223 (1996).  In contrast, "unusual" means "[n]ot usual, common, or ordinary." American Heritage Dictionary, supra, at 1960.  There is obvious daylight between the definitions of these two terms.

The court below failed to analyze whether the event that caused the plaintiff's injuries was unexpected or, synonymously, unforeseen.  Exercising de novo review, see Finamore, 15 F.4th at 58, we turn to that question.

In mounting this inquiry, the problem of perspective looms large: what is or is not expected often lies in the eye of the beholder. An occurrence long foreseen by one person may blindside another. Or — framed in the context of the Montreal Convention — what an airline expects to happen in the course of a flight may not perfectly match a passenger's expectations. The Saks formulation tells us that an unexpected event, external to the passenger, is an accident — but it says nothing about the relevant coign of vantage, leaving open the question: "unexpected by whom?"

The parties suggest different ways in which to fill this void. The plaintiff submits that the appropriate lens through which to ascertain whether a given event is expected belongs to the hypothetical "average traveler." British Airways, in contrast, submits that the proper perspective is that of the airline industry. According to British Airways, the height difference of the staircase's bottom step cannot be a ground for finding the existence of an "accident" under Article 17(1) for the simple reason that such a difference is "normal and routine" across the industry.

We conclude that whether an event is unexpected under the Saks definition of "accident" should be judged from the perspective of a reasonable passenger with ordinary experience in commercial air travel. This conclusion derives from three sources:

the text of the Montreal Convention, its elucidation by both American and foreign courts, and its objects and purposes. We explain briefly.

**1**

The Montreal Convention is a treaty. "The interpretation of a treaty, like the interpretation of a statute, begins with its text." Medellin v. Texas, 552 U.S. 491, 506 (2008). The Supreme Court has made pellucid that the word "accident," as used in Article 17 of the Warsaw Convention — the lineal ancestor of Article 17 of the Montreal Convention — is broad enough to encompass intentional acts. See Olympic Airways, 540 U.S. at 651 & n.7. When used in that sense, referring to an event "happening wholly or partly through human agency," an accident is "an event which under the circumstances is unusual and unexpected by the person to whom it happens." Id. at 651 n.6 (quoting Black's Law Dictionary 15 (6th ed. 1990) (emphasis supplied)). This definition recognizes that even an intentional act may be an accident from the point of view of a victim who did not anticipate its occurrence. In much the same vein, the plain meaning of the word "accident" in Article 17(1) of the Montreal Convention suggests a focus on the perspective of the passenger, not the airline.

In interpreting Article 17 of the Warsaw Convention, the Saks Court relied in part on "the weight of precedent in foreign and American courts." 470 U.S. at 400. We too do so.[5] The trend of this jurisprudence runs in favor of assessing whether an event is unexpected from the standpoint of an ordinary, reasonable passenger in the plaintiff's position.

In the lead opinion for the House of Lords in Deep Vein Thrombosis and Air Travel Group Litigation — a Warsaw Convention case — Lord Scott wrote that courts must examine whether the event was "'unintended and unexpected' from the viewpoint of the victim of the accident" because "[i]t is the injured passenger who must suffer the 'accident' and it is from his perspective that the quality of the happening must be considered." [2005] UKHL 72,

---

[5] Although reliance on the opinions of foreign tribunals may be controversial in other settings, see, e.g., Roper v. Simmons, 543 U.S. 551, 622-28 (2005) (Scalia, J., dissenting) (rejecting resort to "the views of foreigners" and "alien law" when interpreting American law); Foster v. Florida, 537 U.S. 990, 990 n.* (2002) (Thomas, J., concurring) ("[T]his Court's Eighth Amendment jurisprudence should not impose foreign moods, fads, or fashions on Americans."), it is common ground that such opinions are instructive in interpreting treaties, see, e.g., GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC, 140 S. Ct. 1637, 1646 (2020); Olympic Airways, 540 U.S. at 660 (Scalia, J., dissenting) ("We can, and should, look to decisions of other signatories when we interpret treaty provisions."). Thus, the Saks Court concluded that "[i]n determining precisely what causes can be considered accidents, we find the opinions of our sister signatories to be entitled to considerable weight." 470 U.S. at 404 (internal quotation omitted).

[2006] 1 AC (HL) 495, 504, ¶ 14 (appeal taken from Eng.). American courts have expressed similar views. See, e.g., Campbell v. Air Jamaica Ltd., 760 F.3d 1165, 1173 (11th Cir. 2014) (stating that the "Article 17 analysis . . . measures only whether the event was unusual from the viewpoint of the passenger, not the carrier").

We hasten to add a cautionary note. Lord Scott's opinion — if read literally — could be taken as privileging the passenger's subjective expectations, no matter how idiosyncratic. Such a reading, however, has been roundly rejected. By and large, courts have been unwilling to adopt a subjective test. See Gotz v. Delta Airlines, Inc., 12 F. Supp. 2d 199, 202 (D. Mass. 1998) (stating that Saks requires an objective inquiry and "plaintiff's subjective expectations" do not control); see also Craig v. Compagnie Nationale Air France, 45 F.3d 435, 1994 WL 711916, at *3 (9th Cir. 1994) (unpublished table decision) (holding that plaintiff's "belief is not controlling" with respect to whether event was expected); Tseng v. El Al Israel Airlines, Ltd., 122 F.3d 99, 103 (2d Cir. 1997) (same), rev'd on other grounds, 525 U.S. 155 (1999). Thus, the court below reasoned — and neither party disputes — that the relevant inquiry is "an objective one, not a subjective inquiry based on the plaintiff's personal expectations." Moore, 511 F. Supp. 3d at 5.

The Court of Justice for the European Union (CJEU) also has rejected any reading of "accident" that is "based on the

perspective of each passenger."  Case C-70/20, YL v. Altenrhein Luftfahrt GmbH, ECLI:EU:C:2021:379, ¶ 35 (May 12, 2021).[6]  The court explained that a subjective "interpretation could lead to a paradoxical result if the same event were classified as 'unforeseen' and, therefore, as an 'accident' for certain passengers, but not for others."  Id.  Moreover, a purely subjective approach "could extend [the concept of 'accident'] in an unreasonable manner to the detriment of air carriers."  Id. ¶ 36.  The CJEU found this second consideration especially significant given the Montreal Convention's preamble, which declares that an object of the treaty is "[achieving an] equitable balance of interests."  Id. (quoting Montreal Convention, pmbl.).

We agree with these courts, domestic and foreign, that an individual passenger's subjective beliefs do not inform the question of whether an event is unexpected and, thus, may be found to be an accident.  The appropriate inquiry is an objective one.

In conducting that inquiry, there is no principled basis for giving primacy to the perspective of either the air carrier or the airline industry as a whole.  Few, if any, cases take such an

_____

[6] We note that — unlike the courts of many jurisdictions — the CJEU has adopted a definition of "accident" under Article 17(1) that differs somewhat from the Saks definition:  "an unforeseen, harmful and involuntary event."  YL, ECLI:EU:C:2021:379, ¶ 20 (internal quotation omitted).  This case does not require us to explore the effect, if any, of the discrepancy between this definition and the Saks definition.

approach.[7]   Instead, courts typically toe the line drawn by the Supreme Court of Victoria (Australia), which indicates that "what is . . . 'unexpected' . . . should be ascertained from the viewpoint of an ordinary, reasonable passenger."  Qantas Ltd. v. Povey, [2003] VSCA 227, ¶ 22, 2003 WL 23000692 (Dec. 23, 2003) (Ormiston, J.A.), aff'd, [2005] HCA 33.

Many other courts have elected to analyze whether an event is expected through the prism of an "ordinary" or "reasonable" passenger.  E.g., Garcia Ramos v. Transmeridian Airlines, Inc., 385 F. Supp. 2d 137, 141 (D.P.R. 2005) ("[A] reasonable passenger would not expect a fellow passenger to fall on top of him."); Maxwell v. Aer Lingus Ltd., 122 F. Supp. 2d 210, 211 (D. Mass. 2000) ("While a reasonable passenger would expect some shifting of the contents of an overhead bin, . . . she would not expect . . . to be struck on the head by a falling object when the bin above her seat is opened by a fellow passenger."); Fulop v. Malev Hungarian Airlines, 175 F. Supp. 2d 651, 665 (S.D.N.Y. 2001) (inquiring into what "the ordinary traveler reasonably would

_____

[7] One outlier may be Blansett v. Continental Airlines, Inc., in which the Fifth Circuit held that failure to warn of the risk of developing deep vein thrombosis syndrome could not be an accident under Article 17 because the airline's "policy [of not requiring such warnings] was far from unique" among international carriers at the time "and was fully in accord with the expectations of the [Federal Aviation Administration]."  379 F.3d 177, 182 (5th Cir. 2004).  To the extent — if at all — that Blansett spurns a passenger-focused perspective as to whether an event is unexpected, we reject its reasoning.

- 18 -

expect").  In a case involving an allegedly traumatizing security inspection at an airport, for example, the Second Circuit held that "[w]hether [the passenger] expected to be subjected to a security search is not a relevant consideration because she reasonably should have been aware that she might be."  Tseng, 122 F.3d at 103.  We follow this trend and hold that the inquiry into whether an event is "expected" should be conducted from the perspective of the ordinary, reasonable passenger.

**3**

An inquiring court should, when possible, construe the terms of a treaty in light of the treaty's "objects and purposes." Monasky v. Taglieri, 140 S. Ct. 719, 728 (2020) (quoting Abbott v. Abbott, 560 U.S. 1, 20 (2010)); see Eastern Airlines, Inc. v. Floyd, 499 U.S. 530, 546 (1991) (reading Article 17 of the Warsaw Convention in line with the treaty's "purpose"); Vienna Convention on the Law of Treaties, opened for signature May 23, 1969, 1155 U.N.T.S. 331, art. 31(1) ("A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.").  The "primary purpose" of the Warsaw Convention was "limiting the liability of air carriers in order to foster the growth of the fledgling commercial aviation industry." Floyd, 499 U.S. at 546.  As commercial air travel matured, the Warsaw Convention's solicitude toward airlines at the expense of

travelers became problematic. A course correction was due and, in 1999, the Montreal Convention was drafted to supplant the Warsaw Convention. In 2003, the Montreal Convention was ratified by the United States and entered into force internationally. See Ehrlich v. Am. Airlines, Inc., 360 F.3d 366, 371 n.4, 372 (2d Cir. 2004).

The Montreal Convention does not mince words: it declares its purpose, in part, as "ensuring protection of the interests of consumers in international carriage by air" and recognizes "the need for equitable compensation based on the principle of restitution." Montreal Convention, pmbl. Scholars aptly "have described the Montreal Convention as a treaty that favors passengers rather than airlines," Ehrlich, 360 F.3d at 371 n.4, and have read its preamble as "acknowledging the previous imbalance of interests and staking out where the priority lies," Bin Cheng, A New Era in the Law of International Carriage by Air: From Warsaw (1929) to Montreal (1999), 53 Int'l & Compar. L.Q. 833, 844 (2004). Even so, the Montreal Convention is not one-sided. The driving forces behind it explicitly strive to attain "an equitable balance of interests." Montreal Convention, pmbl.; see George N. Tompkins, Jr., Liability Rules Applicable to International Air Transportation as Developed by the Courts in the United States 34 (2010) (concluding that the Montreal Convention "approach is a shift away from the approach of the 1929 Warsaw Convention, which primarily favored airlines, to a treaty which

- 20 -

shows increased concern for and recognition of the rights of passengers . . ., while still protecting airlines from crippling liability").  When all is said and done, however, the rights and interests of passengers cannot lightly be brushed aside.  Given the Convention's intent to strike an equitable balance that better protects consumers, it would be incongruous if recovery were impossible for injuries suffered due to events that an ordinary, reasonable passenger would not expect to happen.

We add, moreover, that fixing the inquiry on the passenger's objectively reasonable expectations is consistent with the specific purpose of holding air carriers liable (to a point) for injuries caused by accidents, whether or not they acted negligently.  As a matter of efficient "'distribution of risk, the carrier would seem, in nearly every case, to be in the best position to . . . spread the risk most economically' regardless of fault."  Wallace v. Korean Air, 214 F.3d 293, 297 (2d Cir. 2000) (omission in original) (quoting Andreas F. Lowenfeld & Allan I. Mendelsohn, The United States and The Warsaw Convention, 80 Harv. L. Rev. 497, 599-600 (1967)); see Magan v. Lufthansa German Airlines, 339 F.3d 158, 162 n.3 (2nd Cir. 2003).  In light of this consideration, it would be perverse to force injured plaintiffs to bear the cost of accidents unforeseeable to reasonable passengers with ordinary experience in commercial air travel, especially when

such incidents are within the reasonable anticipation of airlines and thus more easily built into their actuarial calculus.

**4**

The short of it is that the Montreal Convention's text, its construction by the majority of domestic and foreign courts, and its objects and purposes all converge on the conclusion that a passenger's objectively reasonable expectations should control. We hold, therefore, that under the Saks definition of "accident" applicable to Article 17(1) of the Montreal Convention, an event is unexpected when a reasonable passenger with ordinary experience in commercial air travel, standing in the plaintiff's shoes, would not expect that event to happen.[8]

**C**

What remains is for us to apply the discerned standard to the facts of the case at hand. We do so "flexibly" and "after assessment of all the circumstances surrounding a passenger's injuries." Saks, 470 U.S. at 405. If the evidence is conflicting, "it is for the trier of fact to decide whether an 'accident' . . . caused the passenger's injury." Id. We conclude

---

[8] We need not — and do not — decide today whether a passenger's subjective expectations might be relevant under Article 17(1) in the case of a passenger with exceptional experience in and knowledge about commercial air travel, such that she actually foresaw an event that would have been unexpected by an ordinary passenger. By the same token, we do not decide whether or how the objective inquiry should take account of passengers with special cognitive facilities (such as children).

that the record presents sufficient evidence for a reasonable jury to find that the plaintiff's injuries were caused by an "accident" within the meaning of Article 17(1).

The combined force of four facts supports (but does not compel) the inference that an ordinary, reasonable passenger in the plaintiff's position would not have expected to disembark on a staircase in which the bottom step had such a yawning riser height. First, all of the steps on the staircase before the bottom step were of a uniform height — a height several inches less than that of the bottom step. The plaintiff's expert asserted that someone descending a staircase "tend[s] to develop a specific gait and expectation that the stairs are uniform." That "expectation" evolves into a "stepping pattern" as the staircase progresses and "an unexpected difference in stair dimensions" can interrupt the pattern, causing a fall. Relatedly, the expert opined that the plaintiff fell because she took an "air step," which he described as occurring due to "an unexpected depression or step down." A jury could find this analysis convincing.

Second, the plaintiff's travel companion, Ms. Burnett, testified that she was "surprised" because "the bottom step didn't arrive when [she] thought it would." A jury could appropriately take Ms. Burnett as a proxy for the ordinary passenger, whose expectations were, under the circumstances, objectively

reasonable. And such a jury could credit her testimony that the height of the bottom step was unexpected.

Third, a jury could find that the passengers were not warned of the bottom step's elevated riser height. On this point, British Airways does not deny the absence of any specific warnings but insists that it was under no obligation to give any such warnings. Even assuming (without deciding) that no such obligation existed, the absence of an obligation does not take British Airways very far. Cf. Phifer v. Icelandair, 652 F.3d 1222, 1224 (9th Cir. 2011) ("Although [Federal Aviation Administration] requirements may be relevant to the . . . 'accident' analysis, they are not dispositive of it."). The issue is not whether British Airways deviated from the appropriate standard of care but, rather, whether an ordinary, reasonable passenger disembarking from the aircraft would have expected to traverse a staircase in which the bottom step had a riser height significantly greater than the earlier steps. A jury could find that the absence of any warning calling attention to that height differential was relevant to a passenger's expectations of what lay ahead.

Fourth, the standards cited by the plaintiff's expert could supply a reasonable jury with grounds for an inference that using such a staircase was unexpected. Those standards variously state that "[t]he maximum rise that people can be expected to negotiate safely is 220mm," or 8.7 inches; that "[a]ll steps of a

stair flight shall be designed with the same riser height"; and that the distance from the ground to the tread surface of the bottom step "shall not exceed 260mm," or 10.24 inches.

British Airways contends, and the district court agreed, that these standards are irrelevant because they are "voluntary." Moore, 511 F. Supp. 3d at 6. But even voluntary standards may be evidence of what an ordinary, reasonable passenger might expect to encounter.

British Airways also contends that these standards are not probative because they do not apply to mobile staircases of the kind at issue here. This contention lands closer to the mark, but it cannot settle the matter on summary judgment. At the summary judgment stage, the facts must be taken in the light most congenial to the plaintiff. See Houlton Citizens' Coal., 175 F.3d at 184.

Whether the standards relied on by the plaintiff's expert provide guidance for mobile staircases is, at a minimum, a disputed question of fact. Although British Standard 5395-1:2000, by its terms, "does not apply to steps or stairs which are not connected to a building," the expert explained in his deposition that the section of that standard referring to "the negotiation of stairs" higher than 8.7 inches applies equally to all types of stairs. Specifically, the expert stated that "I don't believe there's any difference between negotiating stairs that are on

wheels or negotiating stairs attached to a building."  A jury, accepting this expert opinion, could reasonably find the disputed standard applicable here.  And in all events, the other standard, "Aircraft Ground Support Equipment - Specific Requirements - Part 1: Passenger Stairs," appears to apply squarely to the type of stairs involved in this incident.

Of course, the evidence is not exclusively on the plaintiff's side.  For instance, it is undisputed that mobile staircases of the kind employed here are commonly used in the airline industry.  The flight crew's first officer described the use of such mobile staircases to disembark passengers from an aircraft, without contradiction, as "incredibly normal" and "very frequent."  Similarly, the director of the cabin crew described the use of such mobile staircases — again, without contradiction — as "quite an acceptable way to disembark the aircraft."  Even the plaintiff acknowledged that she had seen mobile staircases used at airports in the past and that she herself had used such a staircase to board a flight on at least one occasion (though never to disembark).

From these and other pieces of evidence, a jury may be persuaded that an ordinary, reasonable passenger would share the perceptions of the flight crew and, accordingly, that nothing about the use of this staircase could be said to be unexpected.  Saks teaches, though, that "where there is contradictory evidence, it

- 26 -

is for the trier of fact to decide whether an 'accident' as [defined in Saks] caused the passenger's injury." Saks, 470 U.S. at 405. This is such a case. See Sensat v. Sw. Airlines Co., 363 F. Supp. 3d 815, 823 (E.D. Mich. 2019) (holding that "the gap in an airstairs tread reasonably could be found to be . . . 'unexpected' to a passenger who was not warned of its presence and had no reason to anticipate or spot the hazard"); Garrett v. Emirates, No. 14-02717, 2018 WL 1316976, at *1, 8 (E.D. Cal. Mar. 14, 2018) (finding trialworthy question of fact as to whether "accident" occurred where, in part, mobile staircase "contained a landing partway down that was approximately twice the size of the stairs and the landing did not contain any warnings to differentiate it from the other stairs" and airline did not "warn passengers they would be deplaning via a non-uniform stairway that contained a landing"); Singhal v. British Airways Plc, [2007] 10 WLUK 552, ¶¶ 4, 38, 2008 WL 4820370 (Oct. 11, 2007) (Wandsworth County Ct.) (Eng.) (finding "accident" where plaintiff fell due to "unexpected and unforeseen six inch step" from aircraft door to jetway and no warnings of this change in level were provided).

The case upon which British Airways relies to counter this conclusion, see Barclay v. British Airways plc, [2008] EWCA (Civ) 1419, [2010] QB 187, 2008 WL 5240582 (Eng.), does not assist its cause. There, the England and Wales Court of Appeal held that the passenger's injuries were not caused by an "accident" under

Article 17(1) when the plaintiff's foot "slipped" on "a narrow plastic strip running under the seats and covering . . . the seat fix tracking."  Id. ¶¶ 4-5, 36.  Whether the presence of such a plastic strip was expected — as it might well have been — says nothing about whether disembarking on the staircase that British Airways compelled the plaintiff to use was expected.  And at any rate, the court's inquiry in Barclay focused on whether the slip itself may qualify as the "event" constituting the "accident" under Article 17(1), id. ¶¶ 30, 34-35, a question not presented in this appeal.

## III

There is one loose end.  The plaintiff also appeals the district court's denial of her (untimely) motion for partial summary judgment.  As we have explained, however, the record reveals "contradictory evidence" as to whether an accident took place, which precludes summary judgment for either party on the Montreal Convention claim.  Saks, 470 U.S. at 405.

The plaintiff seeks to forestall this fate by pointing to certain paragraphs in her statement of material facts, which she argues should have been deemed admitted because British Airways allegedly failed to contest them.  See D. Mass. R. 56.1.  This argument leads nowhere. Even assuming that those paragraphs should have been deemed admitted, the outcome is the same.  Those paragraphs do little more than recapitulate the plaintiff's

general narrative and certain conclusions of her expert. Nothing in the plaintiff's statement of facts conclusively establishes that there was an accident within the meaning of the Montreal Convention. We therefore uphold the district court's denial of the plaintiff's cross-motion for partial summary judgment.

## IV

We need go no further. On this scumbled record, it is for a jury to decide whether the plaintiff's injuries resulted from an accident within the meaning of the Montreal Convention. It follows that the district court erred in granting summary judgment in favor of British Airways. Consequently, we vacate that judgment. For essentially the same reason, we affirm the district court's denial of the plaintiff's motion for partial summary judgment. And in the end, we remand for further proceedings consistent with this opinion. Two-thirds costs shall be taxed in favor of the plaintiff.

**<u>Affirmed in part, vacated in part, and remanded</u>**.